**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UHLIG LLC d/b/a CONDOCERTS and d/b/a WELCOMELINK, | § § § | |
| Plaintiff/Counter-Defendant, | § § | JURY TRIAL DEMANDED |
| v. | § § | |
| REALPAGE, INC., and TOMTE, LLC d/b/a REXERA, | § § | Case No. 2:26-cv-02144-TC-ADM |
| Defendants/Counter-Plaintiffs. | § § § | |

**DEFENDANTS/COUNTER-PLAINTIFFS REALPAGE, INC. AND
TOMTE, LLC D/B/A REXERA'S ANSWER AND ORIGINAL COUNTERCLAIM**

Defendants RealPage, Inc. ("RealPage") and TOMTE LLC d/b/a Rexera ("Rexera") (together, "Defendants") file this Answer to the Complaint filed by Plaintiff Uhlig LLC d/b/a CondoCerts and d/b/a WelcomeLink ("Uhlig" or "Plaintiff").

**PRELIMINARY STATEMENT**

This case is about who controls access to documents that state law says must be made available. Every week in Kansas, families buy and sell homes in HOA and condominium communities. Every one of those closings turns on a packet of documents, commonly called "estoppel certificates," that state law requires the association to produce within a matter of days.

Rexera exists to make sure those documents arrive on time. When a title company or lender hires Rexera for a closing, Rexera identifies whether the property is in an HOA or condominium community, locates the party that holds the community's closing documents (sometimes the association itself, sometimes a property management company, sometimes

a platform like CondoCerts), requests the estoppel certificate and any other required documents, pays the association's fee, and delivers the documents on the closing timeline.

Rexera's promise to its customers is simple: whoever holds the documents, Rexera finds them and gets them. Rexera built proprietary technology, including agentic AI deployed under contractual authority from Rexera's clients, to do this at scale: find, request, and deliver documents at the speed real estate closings demand. Rexera's agents access platforms the way a human user would: through the published interface, taking the same actions a human user would take to find a property, place an order, and follow it through to delivery. And Rexera pays the association's (and CondoCerts') full asking price for every document it orders, no markup, no haggle.

RealPage, Inc. is the ultimate parent company of Rexera. RealPage is also the parent company of HomeWiseDocs, which operates a platform that, like CondoCerts, transmits HOA and condominium documents for the HOAs and the property management companies (often referred to as "PMCs") that represent them. HomeWiseDocs and CondoCerts compete for the same property-management business. Rexera does not. Rexera works for title companies and lenders, not for property managers.

Uhlig runs CondoCerts and WelcomeLink. Through contracts with property management companies that override statutory delivery obligations, Uhlig forbids those companies, and the HOAs and condominium associations they represent, from delivering estoppel certificates to anyone except through CondoCerts on Uhlig's terms. State law requires the associations to deliver those documents to authorized requestors (including, in various states, owners, buyers, lenders, title companies, and their agents). Uhlig's contracts override that requirement. The sole alternative Uhlig offers is a so-called "Manual Ordering

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims**          **Page 2 of 54**

Process" that Uhlig itself admits is "rarely used" and accounts for a "negligible portion" of the documents it delivers. Doc. 1 Compl. ¶ 15. Uhlig designed that process to fail: wet-ink signatures on separate forms for each order, payment by check or money order mailed to Kansas, no rush processing, and the possibility of restarting the entire sequence if Uhlig identifies any "error or omission."

For every property under a Uhlig-contracted property manager, Uhlig has forced Rexera to fall short of its promise to its customers. Rexera cannot deliver the documents on time, because Uhlig has closed the only functional channel through which the associations are allowed to fulfill their statutory delivery obligations. The cost falls on homeowners whose closings stall, on title companies that scramble for workarounds, and on lenders whose rate locks expire. When anyone tries to get the documents through any other channel—including direct requests to the HOA who own the documents or their property management companies—Uhlig sues.

For the fifth time in five years, Uhlig has sued a company in the estoppel certificate industry for alleged misuse of its platform.[1] This one is different. It's not about what Rexera did (on information and belief, Uhlig allows other companies similar to Rexera to access its platform with AI). It's about Rexera's affiliation with RealPage.

Just before this lawsuit was filed, RealPage rejected Uhlig's demand that RealPage pay $85 million over fair market value to acquire CondoCerts. RealPage's rejection was warranted, however, because Uhlig's business is built on sand.

---

[1] *See Uhlig LLC d/b/a CondoCerts and d/b/a WelcomeLink v. CoreLogic, Inc.*, Cause No. 2:21-cv-2543-DDC (D. Kan); *Uhlig LLC d/b/a CondoCerts and d/b/a WelcomeLink v. PropLogix, LLC*, No. 2:22-cv-2475-KHV-ADM (D. Kan.); *Uhlig LLC d/b/a CondoCerts and d/b/a WelcomeLink v. Stellar Innov. Sols. Corp.*, No. 2:23-cv-2260-JWB-TJJ (D. Kan.); *Uhlig LLC d/b/a CondoCerts and d/b/a WelcomeLink v. Privo Corp.*, No. 2:23-cv-2292-KHV-RES (D. Kan.).

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims        Page 3 of 54**

Uhlig framed the prior cases as about IP protection. It tries to do the same here. *See, e.g.*, Doc. 1 ¶¶ 16–27, 118–46. But this framing ignores a fundamental question about not only this case, but Uhlig's business model itself: Can a party privatize access to public records, that state law requires to be disclosed, by claiming the public records as trade secrets, enforcing that claim through exclusivity agreements and serial litigation, and then profiting from its self-awarded gatekeeper status?

The answer is no. Uhlig's theory fails at every step: the information is not protectable; its exclusivity agreements cannot override statutory disclosure requirements; and the lawsuit is not what it purports to be. Rexera paid full price for every certificate it ordered. Indeed, since 2022, Rexera has placed over 13,000 orders on Uhlig's portals and paid Uhlig more than $3.5 million. But Uhlig sued anyway—just days after RealPage rejected Uhlig's unreasonable demands in a months-long commercial negotiation.

***First, Uhlig has no trade secrets.*** The crux of Uhlig's theory turns on the claim that estoppel certificates are somehow *Uhlig's trade secrets*. But common sense shows that can't be true. They are public records required for real estate closings. They originate from the HOAs and their PMCs. Uhlig didn't create, doesn't own, and has no legal right to control the documents. Nor are the estoppel certificates proprietary or confidential to Uhlig. Uhlig's role is simply to transmit documents for its customers, passing estoppel certificates from one third party to another. Doing so doesn't make the estoppel certificates Uhlig's, much less Uhlig's trade secrets. Precedent from Uhlig's prior litigation in this District drives that home:

> Uhlig has failed to allege facts which establish that (1) Community Information belongs to Uhlig and is not readily ascertainable by proper means (<u>i.e.</u> purchase of an estoppel certificate) or (2) Uhlig took reasonable measures to protect the secrecy of such information.

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims**                    **Page 4 of 54**

*Uhlig LLC d/b/a CondoCerts and d/b/a WelcomeLink v. PropLogix, LLC*, No. 2:22-cv-2475-KHV-ADM, Doc. 290 Mem. & Order at 7 (D. Kan. Mar. 5, 2024); *cf.* Doc. 1 Compl. ¶ 119 ("Uhlig's compilations of Community Information constitute trade secrets . . .").

***Second, Uhlig cannot use private contracts to override the associations' statutory delivery obligations.*** Uhlig's standard PMC contract requires PMCs to route "substantially all" of their HOA document transactions through the CondoCerts platform. Uhlig has admitted here (and in other litigation in this District) that this means CondoCerts, and CondoCerts alone, can deliver documents that the associations are, in most cases, legally obligated to deliver. Doc. 1 Compl. ¶ 11 ("For Uhlig's Clients, Uhlig is the only authorized third party with access to and authorization to share their Community Information.").[2]

Exclusivity itself is not necessarily a problem. An exclusive contract between a vendor and a PMC could be permissible if documents were still delivered in accordance with state law. But CondoCerts doesn't do that. It overlays its own labyrinthine terms and conditions on top of any statutory requirements. And "if users do not accept the terms and conditions," or "are suspected of violating" the terms and conditions, then "they are not allowed to use" the CondoCerts platform *even if they are entitled to the documents under state law.* Doc. 1 ¶ 14. Uhlig tries to mask this with its "Manual Ordering Process." But that process, which Uhlig itself admits is "rarely used" and accounts for a "negligible portion" of transactions, is

---

[2] *See, e.g.*, *Uhlig LLC d/b/a CondoCerts and d/b/a WelcomeLink v. PropLogix, LLC*, No. 2:22-cv-2475-KHV-ADM, Doc. 211 3d Am. Compl. ¶ 96 (D. Kan. Dec. 20, 2023) ("PropLogix was aware of Uhlig's exclusive agreement with Uhlig's Clients to receive and complete requests for Community Information for the Uhlig Represented Communities when PropLogix contacted the Uhlig Represented Communities to obtain Community Information directly from them.").

designed to fail.[3] The Manual Ordering Process cannot feasibly be completed within the statutory timeframes that govern the delivery of estoppel certificates.

The result: any party seeking HOA documents for a real estate closing from an entity that has contracted with CondoCerts must go through CondoCerts, pay CondoCerts' fees, and accept CondoCerts' demands, regardless of whether those demands contradict statutory requirements. If the party tries to sidestep CondoCerts and get the documents directly from the HOAs or their PMCs, Uhlig sues. *See, e.g.*, *Uhlig LLC d/b/a CondoCerts and d/b/a WelcomeLink v. PropLogix, LLC*, No. 2:22-cv-2475-KHV-ADM, Doc. 211 3d Am. Compl. ¶¶ 85–103 (D. Kan. Dec. 20, 2023) (suing for tortious interference with exclusive PMC arrangement because PropLogix asked "Uhlig Represented Communities to provide Community Information directly to PropLogix" without CondoCerts' involvement.").

Transaction participants, and Rexera acting on their behalf, have a right to access these documents. CondoCerts' attempt to condition that access on its own whim and preference violates state law as well as basic notions of fair play and competition.

***Third, this lawsuit is part of Uhlig's broader leverage campaign to extract money from Rexera and RealPage for supposed rights Uhlig cannot legally enforce.*** Uhlig protects its self-awarded gatekeeper status by grinding down would-be challengers with overaggressive litigation and PR campaigns. Since 2021, Uhlig has filed four lawsuits in this

---

[3] This so-called "Manual Ordering Process" requires, among other things: (1) separate written authorization forms bearing original wet-ink signatures for each document request; (2) completion of a "Manual Order Pre-Submission Form,"; (3) emailing PDFs with wet-ink signatures to a CondoCerts email address; (4) awaiting "necessary order instructions" and an "order form" from CondoCerts; (5) completing additional forms and providing "supporting documentation required by the Order Package checklist,"; (6) payment by "check or money order ONLY,"; (7) completing all requirements separately for each "single parcel/unit with a single payment,"; (8) mailing the Order Package to CondoCerts' physical address in Kansas via hand delivery, USPS First-Class Mail, or overnight courier; (9) awaiting CondoCerts' confirmation and verification; (10) addressing any purported "errors or omissions identified by CondoCerts,"; (11) if any changes are required, restarting the entire process from the beginning; and (12) no rush processing is available.

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims          Page 6 of 54**

District over alleged misuse of the CondoCerts platform, none of which reached a contested disposition on the merits.[4] Each involved the same counsel and the same or similar theories.

Defendants will show that Uhlig's claims are false. Defendants haven't stolen anyone's data or Uhlig's supposed trade secrets. And Uhlig has sustained no damages. Rexera ordered documents on behalf of title companies and lenders closing real estate transactions, and paid full price for every order it placed.

Uhlig's abusive litigation, however, is real. So is Uhlig's coordinated threat-and-disinformation campaign against RealPage and Rexera, which has caused RealPage and Rexera to suffer real harm, including lost customers and reputational damage. And so are Uhlig's targeted business practices and restrictions, which seek to squeeze RealPage and Rexera out of the market.

Before filing this lawsuit, Uhlig sent demand letters to RealPage threatening litigation unless RealPage acceded to Uhlig's demands within days. In October 2025, Uhlig demanded that Rexera "immediately cease and desist" from accessing the CondoCerts platform, attached a draft complaint, and imposed a 48-hour deadline for response. Uhlig asserted that Rexera could no longer access the CondoCerts platform and instead had to process transactions through its commercially unreasonable and deliberately ineffective Manual Ordering Process.

Uhlig designed this unwieldy process to impede targets like Rexera from obtaining the requisite documentation soon enough to close real estate deals timely, thereby preventing Rexera from performing its contractual duties and disrupting Rexera's customer

---

[4] *See supra* n.1.

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims            Page 7 of 54**

relationships. Coupled with the exclusivity requirements that Uhlig imposes on its PMC customers, the net effect of the Manual Ordering Process is to completely bar RealPage and Rexera from doing business for title companies, lenders, buyers and sellers at properties with HOAs that Uhlig also serves. These abuses have interfered with over one thousand individual customer transactions that Rexera was engaged to process.

This case is not—and never has been—about Uhlig enforcing legitimate legal rights. It is a leverage play. Uhlig had been in discussions with RealPage about a potential sale of Uhlig's business and demanded approximately $85 million more for CondoCerts than its fair market value. RealPage declined. Uhlig filed this lawsuit just days after RealPage rejected Uhlig's unreasonable acquisition demand, and launched a coordinated campaign of disinformation and commercial coercion through threats of reputational destruction directed at RealPage's and Rexera's customers.

Uhlig intends to destroy Rexera's and RealPage's business relationships, poison Rexera's and RealPage's reputations in the industry, and inflict maximum commercial harm unless RealPage capitulates and pays Uhlig's acquisition demand. The campaign has already caused at least 12 PMC customers covering over 134,000 properties to terminate their relationships with RealPage in just the past month, with some reflecting the false accusations disseminated by Uhlig as the reason for their departure (for instance, by requesting an audit of Rexera-involved transaction). In some cases, the departing customers moved their business directly to CondoCerts, the very company spreading the false narrative.

The law provides remedies for what Uhlig has done. Defendants counterclaim for declaratory judgment that Rexera is entitled to access the information Uhlig guards but does

not own, tortious interference, and unfair and deceptive trade practices under the laws of North Carolina, California, and Florida.

## RESPONSES TO SPECIFIC ALLEGATIONS IN COMPLAINT

### PARTIES

1.      Defendants admit the allegations in Paragraph 1.

2.      Defendants admit the allegations in Paragraph 2.

3.      Defendants deny the allegations in Paragraph 3. Tomte was previously a Delaware corporation (Tomte, Inc.) but converted to a Delaware limited liability company (Tomte LLC) in December 2025. Tomte LLC does business as Rexera. Its principal place of business is in Richardson, Texas.

### JURISDICTION AND VENUE

4.      Defendants admit the allegations in Paragraph 4.

5.      Defendants admit the allegations in Paragraph 5.

6.      Defendants admit that this Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367, but deny the remaining allegations including that Defendants have violated the Defend Trade Secrets Act or the Computer Fraud and Abuse Act.

7.      Defendants submit to venue and personal jurisdiction in this Court for purposes of this case, but deny the remaining allegations in Paragraph 7.

### GENERAL ALLEGATIONS

8.      Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8 and therefore such allegations are denied.

9. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9 and therefore such allegations are denied.

10. To the extent Paragraph 10 alleges that Uhlig provides information to "users who require such information for legitimate purposes," Defendants admit that Uhlig operates a platform through which such information may be ordered. Defendants deny the allegations in Paragraph 10 to the extent they characterize the Community Information as "jointly created" by Uhlig and Uhlig's Clients. Defendants aver that estoppel certificates contain information maintained by HOAs and PMCs. As to the remaining allegations, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in Paragraph 10, and therefore such allegations are denied.

11. Defendants deny the allegations in Paragraph 11.

12. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12 concerning the specific means by which Uhlig makes information available, and therefore such allegations are denied. Defendants, however, do not dispute that Uhlig operates digital ordering sites.

13. Defendants admit that access to Uhlig's ordering sites is conditioned on acceptance of certain terms and conditions. Defendants deny that those terms and conditions, properly construed, prohibit the conduct alleged in the Complaint. The Terms of Use contain an agent-access provision permitting users to access the platform "as an agent of, on behalf of or as a representative of any person or entity," and a parenthetical exception permitting use for "reimbursement for charges by your client or customer for which the specific order is made." Defendants also deny any remaining allegations in Paragraph 13.

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims          Page 10 of 54**

14. Defendants admit that users who do not accept the User Agreements or who are suspected of violating them may be directed to the so-called "Manual Ordering Process." Defendants deny that the Manual Ordering Process is a commercially viable alternative to online access and any other allegations in Paragraph 14.

15. Defendants admit that the Manual Ordering Process is rarely used and represents a negligible portion of Community Information managed or delivered by Uhlig. Defendants deny the remaining allegations in Paragraph 15, including that the Manual Ordering Process can feasibly be completed within the statutory timeframes governing the delivery of estoppel certificates in connection with many real estate transactions. Defendants aver that this process is designed to be impracticable and to function as a dead end rather than a genuine alternative to electronic access.

16. Defendants deny the allegations in Paragraph 16.

17. The allegations in Paragraph 17 constitute Uhlig's own, self-serving characterization of the purposes of its User Agreements and Manual Ordering Process. To the extent the paragraph states legal conclusions or characterizations, no response is required, as the agreements and the process speak for themselves. To the extent the paragraph contains factual allegations, Defendants deny the allegations in Paragraph 17.

18. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18 and therefore the allegations are denied.

19. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19, and therefore the allegations are denied.

20. In response to the allegations in Paragraph 20, Defendants admit that estoppel certificates are perishable (in that they cannot be reused for subsequent purchase/sale

transactions of the same property) and time-sensitive (as the statements contained therein are often made as of a particular date that is near the anticipated property closing date.). Defendants deny the characterization that such information is "not publicly available." Defendants further deny any remaining allegations in Paragraph 20.

21. Defendants deny the allegations in Paragraph 21.

22. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 22 and therefore these allegations are denied.

23. In response to the allegations in Paragraph 23, Defendants admit that Uhlig's User Agreements contain certain restrictions. Defendants deny that those restrictions, properly construed, prohibit the conduct alleged in the Complaint. Further, Defendants deny the remaining allegations in Paragraph 23.

24. Defendants deny the allegations in Paragraph 24.

25. Defendants deny the allegations in Paragraph 25.

26. Defendants deny the allegations in Paragraph 26.

27. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 27 and these allegations are denied.

28. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28 and therefore these allegations are denied.

29. In response to the allegations in Paragraph 29, Defendants admit that Uhlig charges fees for Community Information, that in certain instances those fees are statutorily regulated, and that Uhlig retains a processing fee while remitting the balance to its clients. Defendant denies any remaining allegations in Paragraph 29.

30. Defendants deny the allegations in Paragraph 30.

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims          Page 12 of 54**

31.    Defendants deny the allegations in Paragraph 31.

32.    In response to the allegations in Paragraph 32, Defendants admit that Uhlig's User Agreements include the categories of agreements listed in Paragraph 32. Defendants deny any remaining allegations in Paragraph 32.

33.    Defendants admit the allegations in Paragraph 33.

34.    Defendants admit the allegations in Paragraph 34 regarding the steps in the ordering process, but deny any remaining allegations in Paragraph 34.

35.    Defendants admit that the Terms of Use require users to provide current, complete, and accurate registration information, but deny any remaining allegations.

36.    Defendants admit that the Terms of Use contain prohibitions described in Paragraph 36, but Defendants deny that those provisions, properly construed, prohibit Rexera's conduct. Defendants deny any remaining allegations in Paragraph 36.

37.    Defendants admit that the Terms of Use contain an anti-circumvention provision described in Paragraph 37, but deny any remaining allegations in Paragraph 37.

38.    Defendants admit that the Terms of Use contain a competitive-intelligence prohibition described in Paragraph 38, but Defendants deny that Rexera accessed the Ordering Sites "for the purpose of gaining" competitive intelligence. Defendants deny any remaining allegations in Paragraph 38.

39.    Defendants admit that the Terms of Use contain an anti-scraping prohibition described in Paragraph 39, but deny any remaining allegations in Paragraph 39.

40.    Defendants admit that the Account Registration Agreement contains prohibitions on reusing, reselling, or aggregating Community Information for commercial purposes, but deny any remaining allegations.

41. Defendants admit that the Order Submission Agreement contains prohibitions on reusing, reselling, or aggregating Community Information for commercial purposes, but deny any remaining allegations.

42. Defendants admit that a RealPage subsidiary owns and operates a platform called HomeWiseDocs, but deny any remaining allegations.

43. Defendants admit that HomeWiseDocs provides services related to Common Interest Community documentation. Defendants deny the remaining allegations.

44. Defendants admit that RealPage acquired Rexera, and that on or about July 29, 2025, RealPage closed on the transaction through which it acquired Rexera.

45. Defendants admit that Rexera describes certain of its services as involving automated technology for HOA document collection and related services, Defendants deny any remaining allegations.

46. Defendants deny the allegations in this paragraph.

47. Defendants admit that InspectHOA was previously used as an assumed business name of TOMTE, LLC before the entity adopted the name Rexera. Defendants admit that IH Closing and Elite Closing are names associated with Rexera's operations. Defendants admit that IHOA Title and Point 72 Realty are brand and/or domain names associated with TOMTE, LLC. Defendants deny that the entities identified in Paragraph 47 operated independently of Rexera or had any purpose other than to facilitate Rexera's document-retrieval services on behalf of title companies and lenders in connection with specific real estate transactions. Defendants deny any remaining allegations.

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims** **Page 14 of 54**

48.     Defendants admit that Rexera and entities associated with Rexera have registered user accounts, logged in, initiated orders, placed orders, and canceled orders through Uhlig's Ordering Sites. Defendants deny any remaining allegations in Paragraph 48.

49.     Defendants admit that IH Closing and InspectHOA began ordering through Uhlig's Ordering Sites in or around 2020 and 2021, and that in August 2023, Uhlig suspended accounts associated with IHClosing.com and InspectHOA.com email domains. Defendants deny that the suspension was justified by "excessive website traffic" or "suspected misuse" and aver that Uhlig provided no explanation for the suspension despite Rexera's requests. Defendants deny any remaining allegations in Paragraph 49.

50.     Defendants admit that, after the August 2023 suspension of accounts associated with InspectHOA and IH Closing email domains, accounts associated with Rexera continued to access the Uhlig Ordering Sites. Defendants deny the characterization "with high frequency" to the extent it implies improper conduct. Point 72 Realty is a brand and/or domain name of TOMTE, LLC, as stated in response to Paragraph 47. Defendants deny any remaining allegations in Paragraph 50.

51.     Defendants admit that Rexera registered multiple user accounts on the Uhlig Systems. Defendants deny that "many or most" of those accounts were created "using false, fictitious, deceptive and/or misleading identities and user data for the apparent purpose of evading Uhlig's security measures." Defendants deny the remaining allegations in Paragraph 51.

52.     Defendants deny the allegations in Paragraph 52.

53.     Defendants deny the allegations in Paragraph 53.

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims          Page 15 of 54**

54.     Defendants deny the allegations in Paragraph 54 to the extent they characterize unused registrations as evidence of "failed attempts to circumvent" security measures. As to the remaining allegations in Paragraph 54, Defendants lack knowledge or information sufficient to form a belief as to the truth of these allegations and therefore these allegations are denied.

55.     Defendants admit that Rexera and entities associated with Rexera logged onto the Uhlig Ordering Sites a significant number of times, and that a percentage of those logins did not result in completed orders. Defendants deny the characterization that "the only purpose" of the non-ordering activity was to "crawl Uhlig's Ordering Sites, map Uhlig's trade-secret data, and scrape information for competitive purposes." Defendants deny the remaining allegations in Paragraph 55.

56.     Defendants deny the allegations in Paragraph 56.

57.     Defendants deny the allegations in Paragraph 57.

58.     Defendants deny the allegations in Paragraph 58.

59.     Defendants deny the allegations in Paragraph 59.

60.     Defendants deny the allegations in Paragraph 60.

61.     Paragraph 61 contains legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that Rexera, through its accounts, accepted Uhlig's User Agreements in the course of placing orders. Defendants deny that Rexera "resells, reuses, and aggregates" Community Information in breach of those agreements. Rexera retrieves specific documents for specific closings for specific clients and delivers those documents. Defendants deny the remaining allegations in Paragraph 61.

62.     Defendants deny the allegations in Paragraph 62.

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims          Page 16 of 54**

63. Defendants deny the allegations in Paragraph 63.

64. Defendants deny the allegations in Paragraph 64.

65. In response to the allegations in Paragraph 65, Defendants admit that Rexera placed orders through the Uhlig Ordering Sites. Defendants deny the remaining allegations in Paragraph 65.

**FIRST CLAIM FOR RELIEF**
**Against Rexera**
**(Breach of Contract – Terms of Use)**

66. Defendants incorporate their responses to Paragraphs 1 through 65 as though fully set forth herein.

67. Defendants admit that the Terms of Use contain prohibitions described in Paragraph 67, but Defendants deny that Rexera violated any prohibitions in the Terms of Use and remaining allegations in Paragraph 67.

68. Defendants admit that the Terms of Use contain an anti-circumvention provision described in Paragraph 68, but Defendants deny that Rexera failed to comply with any provision in the Terms of Use and remaining allegations in Paragraph 68.

69. Defendants admit that the Terms of Use contain a competitive-intelligence prohibition described in Paragraph 69, but deny that Rexera accessed the Ordering Sites for the purpose of gaining competitive intelligence and also deny the remaining allegations in Paragraph 69.

70. Defendants admit that the Terms of Use contain an anti-scraping prohibition described in Paragraph 70. Defendants deny that Rexera engaged in scraping, crawling, or spidering and any remaining allegations in Paragraph 70.

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims          Page 17 of 54**

71.     Defendants admit that the Terms of Use prohibit resale, reuse, and aggregation of Community Information for commercial purposes, subject to the exception for "reimbursement for charges by your client or customer for which the specific order is made." Defendants deny any remaining allegations in Paragraph 71.

72.     Defendants admit that Rexera, through its accounts, agreed to abide by the Terms of Use as a condition of using the Ordering Sites. Defendants deny any remaining allegations in Paragraph 72.

73.     Defendants admit that entities associated with Rexera accepted the Terms of Use. Defendants deny the characterization that these entities were "merely aliases used by Rexera" and any remaining allegations in Paragraph 73.

74.     Defendants admit that the Terms of Use constitute a contract between Uhlig and users who accept them, but Defendants deny that any contract in this regard is "valid and enforceable" as applied to the conduct at issue. Defendants deny any remaining allegations in Paragraph 74.

75.     Defendants deny the allegations in Paragraph 75.

76.     Defendants deny the allegations in Paragraph 76.

77.     Defendants deny the allegations in Paragraph 77.

78.     Defendants deny the allegations in Paragraph 78.

79.     Defendants deny the allegations in Paragraph 79.

80.     Defendants deny the allegations in Paragraph 80.

81.     Defendants deny the allegations in Paragraph 81.

82.     Defendants deny the allegations in Paragraph 82.

**SECOND CLAIM FOR RELIEF**

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims          Page 18 of 54**

**Against Rexera**
**(Breach of Contract – Account Registration Agreement)**

83. Defendants incorporate their responses to the preceding paragraphs as though fully set forth herein.

84. Defendants admit that the Account Registration Agreement prohibits reuse, resale, and aggregation of Community Information for commercial purposes. Defendants deny any remaining allegations in Paragraph 84.

85. Defendants admit that the Account Registration Agreement also prohibits "Prohibited Uses" as defined in the Terms of Use. Defendants deny any remaining allegations in Paragraph 85.

86. Defendants admit that Rexera registrants agreed to abide by the Account Registration Agreement. Defendants deny any remaining allegations in Paragraph 86.

87. Defendants admit that entities associated with Rexera accepted the Account Registration Agreement. Defendants deny the characterization that these entities are "merely aliases used by Rexera" to the extent that implies deceptive intent. Defendants deny any remaining allegations in Paragraph 87.

88. Defendants admit that the Account Registration Agreement constitutes a contract between Uhlig and users who accept it, but deny that it is "valid and enforceable" as applied to the conduct at issue and any remaining allegations in Paragraph 88.

89. Defendants deny the allegations in Paragraph 89.

90. Defendants deny the allegations in Paragraph 90.

91. Defendants deny the allegations in Paragraph 91.

92. Defendants deny the allegations in Paragraph 92.

93.     Defendants deny the allegations in Paragraph 93.

94.     Defendants deny the allegations in Paragraph 94.

95.     Defendants deny the allegations in Paragraph 95.

96.     Defendants deny the allegations in Paragraph 96.

**THIRD CLAIM FOR RELIEF**
**Against Rexera**
**(Breach of Contract – Order Submission Agreement)**

97.     Defendants incorporate their responses to the preceding paragraphs as though fully set forth herein.

98.     Defendants admit that the Order Submission Agreement prohibits resale, reuse, and aggregation of Community Information for commercial purposes. Defendants deny any remaining allegations in Paragraph 98.

99.     Defendants admit that the Order Submission Agreement contains an anti-circumvention provision described in this paragraph, but Defendants deny any remaining allegations in Paragraph 99.

100.    Defendants admit that the Order Submission Agreement contains a competitive-intelligence prohibition. Defendants deny that Rexera accessed the Ordering Sites for the purpose of gaining competitive intelligence and deny any remaining allegations in Paragraph 100.

101.    Defendants admit that the Order Submission Agreement contains an anti-scraping prohibition. Defendants deny any remaining allegations in Paragraph 101.

102.    Defendants admit that Rexera agreed to the Order Submission Agreement as a condition of placing orders. Defendants deny any remaining allegations in Paragraph 102.

103.    Defendants admit that entities associated with Rexera accepted the Order Submission Agreement. Defendants deny the characterization that these entities are "merely aliases used by Rexera" to the extent that implies deceptive intent and any remaining allegations in Paragraph 103.

104.    Defendants admit that the Order Submission Agreement constitutes a contract between Uhlig and users who accept it, but deny that it is "valid and enforceable" as applied to the conduct at issue and deny any remaining allegations in Paragraph 104.

105.    Defendants deny the allegations in Paragraph 105.

106.    Defendants deny the allegations in Paragraph 106.

107.    Defendants deny the allegations in Paragraph 107.

108.    Defendants deny the allegations in Paragraph 108.

109.    Defendants deny the allegations in Paragraph 109.

## FOURTH CLAIM FOR RELIEF
### Against All Defendants
### (Unjust Enrichment)

110.    Defendants incorporate their responses to the preceding paragraphs as though fully set forth herein.

111.    Defendants deny the allegations in Paragraph 111.

112.    Defendants deny the allegations in Paragraph 112.

113.    Defendants deny the allegations in Paragraph 113.

114.    Defendants deny the allegations in Paragraph 114.

115.    Defendants deny the allegations in Paragraph 115.

116.    Defendants deny the allegations in Paragraph 116.

117.    Defendants deny the allegations in Paragraph 117.

## FIFTH CLAIM FOR RELIEF
### Against All Defendants
### (KUTSA – MISAPPROPRIATION OF TRADE SECRETS)

118. Defendants incorporate their responses to the preceding paragraphs as though fully set forth herein.

119. Defendants deny that Uhlig's compilations of Community Information constitute trade secrets under any applicable state law. Defendants deny any remaining allegations in Paragraph 119.

120. Defendants deny the allegations in Paragraph 120.

121. Defendants deny the allegations in Paragraph 121.

122. Defendants deny the allegations in Paragraph 122.

123. Defendants deny the allegations in Paragraph 123.

124. Defendants deny the allegations in Paragraph 124.

125. Defendants deny the allegations in Paragraph 125.

126. Defendants admit that the User Agreements contain prohibitions described in Paragraph 126. Defendants deny that Rexera violated those prohibitions and remaining allegations in Paragraph 126.

127. Defendants deny the allegations in Paragraph 127.

128. Defendants deny the allegations in Paragraph 128.

## SIXTH CLAIM FOR RELIEF
### Against All Defendants
### (DTSA, 18 U.S.C. § 1836(c) – Misappropriation of Trade Secrets)

129. Defendants incorporate their responses to the preceding paragraphs as though fully set forth herein.

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims          Page 22 of 54**

130.   Defendants deny the allegations in Paragraph 130.

131.   Defendants deny the allegations in Paragraph 131.

132.   Defendants deny the allegations in Paragraph 132.

133.   Defendants deny the allegations in Paragraph 133.

134.   Defendants deny the allegations in Paragraph 134.

135.   Defendants deny the allegations in Paragraph 135.

136.   Defendants deny the allegations in Paragraph 136.

137.   Defendants deny the allegations in Paragraph 137.

138.   Defendants deny the allegations in Paragraph 138.

**SEVENTH CLAIM FOR RELIEF**
**Against Rexera**
**(Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030)**

139.   Defendants incorporate their responses to the preceding paragraphs as though fully set forth herein.

140.   Defendants admit that the Uhlig Systems are used for interstate communication and commerce. Defendants deny that the Uhlig Systems qualify as "protected computers" for purposes of the CFAA claims alleged and deny any remaining allegations in Paragraph 140.

141.   Defendants deny the allegations in Paragraph 141.

142.   Defendants deny the allegations in Paragraph 142.

143.   Defendants deny the allegations in Paragraph 143.

144.   Defendants deny the allegations in Paragraph 144.

145.   Defendants deny the allegations in Paragraph 145.

146.   Defendants deny the allegations in Paragraph 146.

**PRAYER FOR RELIEF**

147.    Defendants deny any allegations in the Prayer for Relief, deny that Uhlig is entitled to any of the relief requested in the Prayer for Relief, and deny every allegation not specifically admitted herein.

**DEFENSES**

Defendants assert the following defenses without assuming any burden of proof or persuasion that applicable law does not place on Defendants:

## I.    Failure to State a Claim

148.    The Complaint, in whole or in part, fails to state a claim upon which relief can be granted.

## II.    Illegality, Public Policy, and Unenforceability

149.    Rexera acts as an authorized requestor under the statutes of multiple states that require associations to deliver estoppel certificates and related closing documents to owners, mortgagees, and their authorized agents and designees. Uhlig's User Agreements, to the extent they purport to restrict access by authorized requestors to statutorily mandated disclosures, are unenforceable as contrary to public policy and illegal under applicable state law. The User Agreements are contracts of adhesion presented on a take-it-or-leave-it basis. The sole alternative, Uhlig's Manual Ordering Process, is designed to be impracticable. Defendants further plead as a defense any statutory provision that permits Defendants' actions or conduct. This defense applies to all claims.

## III.    Unclean Hands

150.    Uhlig comes to this Court with unclean hands. Uhlig has used its PMC contracts, a commercially unviable manual ordering process, and a coordinated disinformation campaign to prevent PMCs and HOAs from delivering documents to authorized requestors through any channel except CondoCerts. Represented by the same counsel in every case, Uhlig has filed multiple lawsuits in the past five years and has not proceeded to trial in any of them. On information and belief, Uhlig allows other companies to access the CondoCerts platform using methods substantially similar to Rexera's, including AI, while singling out Rexera for litigation because RealPage owns a platform that competes with CondoCerts and because RealPage rejected Uhlig's demand that RealPage pay $85 million over fair market value to acquire CondoCerts. Uhlig's inequitable conduct is directly connected to the claims asserted in this action.

## IV.    Failure to Mitigate Damages

151.    Uhlig has failed to mitigate its claimed damages. Rexera paid Uhlig's full asking price for every document ordered through the platform. Uhlig terminated Rexera's access in March 2026, stopping any further ordering activity. Uhlig rejected multiple proposals from RealPage to establish a transparent, monitored access arrangement.

## V.    Waiver and Estoppel

152.    Uhlig waived and is estopped from asserting any claims based on Rexera's use of the Ordering Sites. Uhlig was aware of Rexera's ordering activity for years before filing this action. Uhlig accepted payment for every document Rexera ordered. Uhlig's platform contains no meaningful identity verification or access controls. Uhlig suspended Rexera's predecessor accounts in August 2023 without explanation, and when Rexera sought an explanation, Uhlig provided none.

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims          Page 25 of 54**

## VI.  Statute of Limitations

153.    Uhlig's claims are barred, all or in part, by the applicable statutes of limitations.

## VII.  Unjust Enrichment Barred by Express Contract

154.    Uhlig's unjust enrichment claim (Count IV) is barred because the parties' relationship is governed by express contracts. Unjust enrichment does not lie where an express contract governs the subject matter of the dispute.

## VIII. KUTSA Preemption

155.    Uhlig's claims are preempted and/or barred, all or in part, by the Kansas Uniform Trade Secrets Act.

**RESERVATION OF DEFENSES**

156.    Defendants reserve the right to assert additional defenses as may become available through discovery or further investigation.

<u>**ORIGINAL COUNTERCLAIM**</u>

Separately from the foregoing Answer, Defendants RealPage, Inc. and TOMTE, LLC d/b/a Rexera, as Counterclaim Plaintiffs, file this Original Counterclaim against Uhlig LLC d/b/a CondoCerts and d/b/a WelcomeLink, as Counterclaim Defendant.

**PARTIES**

157.    Counterclaim Plaintiff RealPage, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 2201 Lakeside Blvd., Richardson, Texas 75082.

158.    Counterclaim Plaintiff TOMTE, LLC d/b/a Rexera is a limited liability company organized under the laws of the State of Delaware. On or about July 29, 2025, RealPage closed on its transaction through which it acquired Rexera.

159.    Counterclaim Defendant Uhlig LLC d/b/a CondoCerts and d/b/a WelcomeLink is a Delaware limited liability company with its principal place of business at 8455 Lenexa Drive, Overland Park, Kansas 66214. Uhlig has appeared in this case and may be served with this counterclaim through its counsel of record.

**JURISDICTION AND VENUE**

160.    This Court has subject matter jurisdiction over these counterclaims under 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because the counterclaims arise out of the same transactions or occurrences as Uhlig's claims.

161.    Venue is proper in this Court under 28 U.S.C. § 1391.

**BACKGROUND**

## I.        The Estoppel Certificate Industry

162.    Estoppel certificates are documents that disclose the financial obligations, legal restrictions, and assessments associated with a residential property in a common interest community. They are required for the purchase, sale, financing, and refinancing of real estate in these communities. The information in these certificates is maintained by HOAs for each community and their respective property management companies (often referred to as "PMCs").

163.    Numerous states mandate by statute that HOAs produce estoppel certificates to authorized requestors within specified timeframes. For instance, Florida Statutes Sections 720.30851 and 718.116(8) require associations to issue estoppel certificates "[w]ithin 10 business days after receiving a written or electronic request" from "a parcel owner or the parcel owner's designee, or a parcel mortgagee or the parcel mortgagee's designee."

164.    These statutes generally use broad terms—such as designee, authorized agent, or representative—to describe who can request documents. And generally, the only requirement to obtain documents is payment of a statutorily capped fee. No states deputize private actors like Uhlig to unilaterally impose additional, extra-statutory requirements to obtain documents. *See, e.g.*, Cal. Civ. Code § 4530(a)(3) ("Delivery of the documents required by this section shall not be withheld for any reason nor subject to any condition except the payment of the fee authorized pursuant to subdivision (b).").

## II.        Uhlig's Market Position and Business Model

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims            Page 28 of 54**

165.   Uhlig operates the CondoCerts and WelcomeLink platforms, which are two widely-used electronic channels for ordering estoppel certificates from HOAs and PMCs across the United States.

166.   Uhlig's standard PMC contract requires PMCs to "use [Uhlig's] Resale Service for substantially all transactions involving the Enrolled Units."

167.   The effect: CondoCerts and WelcomeLink are the only channel through which estoppel certificates may be delivered from PMCs that contract with Uhlig. Uhlig uses this contractual architecture to position itself as the sole gatekeeper of information that ***HOAs own*** and that ***state laws require to*** be produced.

168.   Uhlig's only alternative to electronic access is its so-called "Manual Ordering Process." The Manual Ordering Process requires, among other things: (a) the use of separate written authorization forms for each document request, bearing an original signature "separately executed" by the owner, mortgagee, or buyer; (b) the completion of a "Manual Order Pre-Submission Form"; (c) emailing PDFs of the completed documents, each with wet-ink signatures, to a CondoCerts email address; (d) awaiting "necessary order instructions" and delivery of an "order form" from CondoCerts; (e) completing the order form and other forms provided by CondoCerts, as well as providing "additional supporting documentation required by the Order Package checklist"; (f) making payment via "check or money order ONLY payable to CondoCerts"; (g) completing the above requirements separately as to each "single parcel/unit with a single payment"; (h) mailing the completed Order Package to CondoCerts' physical address in Kansas via hand delivery, USPS First-Class Mail, or overnight courier; (i) awaiting CondoCerts' confirmation and verification of the Order Package; (j) addressing any "errors or omissions identified by CondoCerts"; (k) after verification is

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims          Page 29 of 54**

complete, awaiting "processing" by CondoCerts of the order; and (l) if any changes are required to the order, restarting the entire process from the beginning. No rush processing is available under the Manual Ordering Process.

169. The Manual Ordering Process is designed to be commercially unviable. Real estate closings operate on tight deadlines, typically measured in days. State statutes generally require estoppel certificates to be produced within 10 to 15 business days of a request. The Manual Ordering Process—with its requirement of physical mailing to Kansas, payment by check or money order, multi-step verification, and the possibility of having to restart the entire process if any purported errors or omissions are identified—cannot feasibly be completed within these statutory timeframes.

170. The process is a paper trail designed to look like an alternative while functioning practically as a dead end. Uhlig's own Complaint admits that the manual process is "limited to specific documents or services, if any, that may be ordered" and acknowledges that it is "rarely used" and "represents a negligible portion" of the Community Information managed by Uhlig. Doc. 1 Compl. ¶ 15.

## III. Uhlig's Pattern of Serial Litigation

171. Not content with creating contractual obstacles for homeowners obtaining information to which they have a right, Uhlig has also weaponized the judicial system to deter competition. Represented by the same counsel in every case, Uhlig has filed four lawsuits in this District over alleged misuse of the CondoCerts platform, none of which reached a contested disposition on the merits.[5]

---

[5] *See Uhlig LLC d/b/a CondoCerts and d/b/a WelcomeLink v. CoreLogic, Inc.*, Cause No. 2:21-cv-2543-DDC (D. Kan); *Uhlig LLC d/b/a CondoCerts and d/b/a WelcomeLink v. PropLogix, LLC*, No. 2:22-cv-2475-KHV-ADM (D.

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims**      **Page 30 of 54**

172.     In these lawsuits, Uhlig has asserted substantially the same theories: breach of clickwrap agreements, unjust enrichment, and trade secret misappropriation. These theories reappear despite adverse rulings on their validity:

> Uhlig has failed to allege facts which establish that (1) Community Information belongs to Uhlig and is not readily ascertainable by proper means (<u>i.e.</u> purchase of an estoppel certificate) or (2) Uhlig took reasonable measures to protect the secrecy of such information.

*Uhlig LLC d/b/a CondoCerts and d/b/a WelcomeLink v. PropLogix, LLC*, No. 2:22-cv-2475-KHV-ADM, Doc. 290 Mem. & Order at 7 (D. Kan. Mar. 5, 2024); *cf.* Doc. 1 Compl. ¶ 119 ("Uhlig's compilations of Community Information constitute trade secrets . . ."). Despite the aggressive allegations in these lawsuits, Uhlig has not proceeded to trial in a single case.

173.     The pattern is consistent. Uhlig files suit, imposes the burden and expense of litigation on the defendant, and resolves the case on commercial terms before any court can rule on the legality of Uhlig's business model. While the suit is pending, Uhlig bars the counterparty from accessing the documents that Uhlig holds for PMCs (other than via the unviable Manual Ordering Process), effectively preventing it from conducting business. No court has ruled on whether Uhlig's contractual restrictions, commercially unviable manual process, or overriding of statutory designee access are lawful. They are not.

## IV.     Rexera's Business and Its Relationship with Uhlig

174.     Rexera provides document-retrieval and closing-coordination services to title companies, lenders, and other participants in real estate transactions. Rexera's customers

---

Kan.); *Uhlig LLC d/b/a CondoCerts and d/b/a WelcomeLink v. Stellar Innov. Sols. Corp.*, No. 2:23-cv-2260-JWB-TJJ (D. Kan.); *Uhlig LLC d/b/a CondoCerts and d/b/a WelcomeLink v. Privo Corp.*, No. 2:23-cv-2292-KHV-RES (D. Kan.).

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims          Page 31 of 54**

hire Rexera to obtain estoppel certificates, lien searches, and other closing documents required for the purchase, sale, and financing of residential real estate.

175. Rexera uses proprietary technology, including agentic AI, to perform document-retrieval services at scale. Rexera's AI agents operate under contractual authority from Rexera's clients and access platforms the way a human user would: through the published web interface, performing the same actions a human user would perform to find a property, place an order, and track it through delivery. Rexera's agents do not scrape, crawl, or harvest data. They retrieve specific documents for specific closings for specific clients.

176. Rexera acts as an agent of its title company and lender customers, who in turn act on behalf of homeowners and mortgagees in specific real estate transactions. In a typical Rexera transaction, the chain of authority runs from the homeowner or mortgagee to the title company to Rexera. Rexera is sometimes also directly authorized by the homeowner or mortgagee. Rexera orders the estoppel certificate for a specific property, in connection with a specific closing, on behalf of a specific client.

177. Rexera paid Uhlig's full asking price for every estoppel certificate it ordered. Uhlig received the same revenue per transaction from Rexera that it would have received from any other customer. Since 2022, Rexera has placed over 13,000 orders on Uhlig's portals and paid Uhlig more than $3.5 million.

178. Rexera charges its title company and lender customers a service fee for its facilitation services, including research, ordering, tracking, quality review, and delivery. This fee compensates Rexera for its service. It is not a "resale" of the estoppel certificate. As Uhlig's own Terms of Use acknowledge, authorized users may charge their "client or customer" for

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims** **Page 32 of 54**

"reimbursement for charges" in connection with "the specific order." This is exactly what Rexera does; clients are invoiced on a passthrough basis for Uhlig's fees.

179. On or about July 29, 2025, RealPage acquired Rexera. RealPage also owns HomeWiseDocs, a platform that serves HOAs and the PMCs that represent them in the same business as CondoCerts.

180. In September 2025, Uhlig contacted RealPage about Rexera's use of the CondoCerts platform. On October 1, 2025, Uhlig sent a nine-page cease-and-desist letter with a draft complaint attached and demanded compliance within 48 hours.

181. On or about October 6–7, 2025, the parties executed a mutual covenant not to sue, and Uhlig expressed interest in a commercial resolution.

182. The parties engaged in a series of discussions over the following months in an attempt to reach a commercial resolution. Those efforts did not succeed. On March 11, 2026, Uhlig sent a letter formally revoking the covenant not to sue and terminating Rexera's access effective March 13, 2026.

183. Before Uhlig filed this lawsuit, RealPage proposed a transparent, monitored designee access arrangement through which Rexera would access estoppel certificates under a documented protocol with full visibility to Uhlig. Although this proposal should have addressed any legitimate concerns, Uhlig rejected that proposal.

**V.     Uhlig's Counter-Messaging Campaign**

184. After filing this lawsuit on March 13, 2026, Uhlig launched a coordinated campaign to poison RealPage and Rexera's relationships with PMCs, HOA boards, and industry participants.

185.   On March 19, 2026, a PMC sent Rexera a message in response to a routine document request. The message parroted Uhlig's litigation allegations nearly verbatim, falsely asserting that Rexera is "not an authorized party to the transaction" and referencing CondoCerts' "recent communication and legal filings."

186.   On March 20, 2026, another PMC sent RealPage formal notice of termination of its contract with HomeWiseDocs so that the PMC could move its business to CondoCerts. The PMC then made discovery-type requests for information and documents concerning the relationship between HomeWiseDocs and Rexera.

187.   Throughout March, RealPage and Rexera learned of multiple other instances of PMCs and other industry participants having been fed CondoCerts talking points (for instance, "They [Rexera] are apparently taking CondoCerts data and claiming it as their own.") in private communications and at industry meetings and conferences. The upshot and intended effect were clear—these companies "should not be dealing with Rexera" and "Homewise/RealPage is under big fire for this."

188.   Uhlig's campaign operated through three main channels: scripted refusals to engage from PMCs when Rexera tried to interact with them directly to obtain estoppel certificates, contract terminations driven by planted narratives, and industry-event disinformation. Each is documented through independent sources. This campaign was not incidental to the litigation; it was the point of the litigation. Uhlig filed this lawsuit to generate ammunition for its disinformation campaign and to lend the appearance of legitimacy to false accusations it was already disseminating.

189.   Uhlig's smear campaign has had its intended effect. Uhlig's conduct has already interfered with well over one thousand customer transactions that Rexera was engaged to

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims          Page 34 of 54**

process, and caused significant reputational harm to both Rexera and RealPage. This has caused delays, increased costs, and disruption to homeowners, title companies, and other transaction participants who bear no responsibility for Uhlig's dispute with Rexera.

190.    Uhlig has also used the smear campaign to poach RealPage's customers. Several PMCs that were customers of RealPage's HomeWiseDocs platform have terminated their contracts with HomeWiseDocs and moved their business to CondoCerts. These departing customers have expressly cited the false accusations disseminated by Uhlig—including accusations that RealPage was misappropriating data from PMCs and HOAs—as the reason for their departure. In some cases, the departing customers were simply repeating false information they had learned from CondoCerts. Uhlig weaponized its own baseless litigation allegations to steal customers and convert a manufactured legal dispute into an unfair competitive advantage.

## VI.    Uhlig Uses Contracts, Litigation, and Disinformation to Override Statutory Disclosure Requirements

191.    Uhlig's standard PMC contract requires PMCs to use Uhlig's service for "substantially all transactions involving the Enrolled Units." Uhlig wields this restriction in a unique way—not to protect an exclusive client relationship but to inject itself as the exclusive path of delivery for statutorily required documents. Exclusive contracts are not per se improper. For instance, a provision that restricted a PMC from retaining multiple companies to provide electronic access to documents would likely be permissible. Uhlig's contracts, by contrast, restrict PMCs and HOAs from providing estoppel certificates through

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims          Page 35 of 54**

any means other than Uhlig. That means not only that the PMCs and HOAs cannot hire other companies, but also that they themselves cannot provide the documents directly.

192.   Uhlig enforces these contractual requirements through litigation. Uhlig has filed at least four other lawsuits against companies that accessed Uhlig's platform to retrieve documents the associations are statutorily required to produce. Combined, the contracts and the litigation create a system that not only forecloses other electronic providers from delivering estoppel certificates for properties managed by Uhlig-contracted PMCs, but also prohibits the HOAs and PMCs from themselves providing those documents to authorized requestors. When parties try to request estoppel certificates from the HOAs or PMCs directly, Uhlig sues for, among other things, tortious interference:

> 96.   PropLogix was aware of Uhlig's exclusive agreement with Uhlig's Clients to receive and complete requests for Community Information for the Uhlig Represented Communities when PropLogix contacted the Uhlig Represented Communities to obtain Community Information directly from them.
>
> 97.   PropLogix's actions were unjustified and without a legitimate business purpose.
>
> 98.   PropLogix's actions were designed to encourage Uhlig's Clients to breach their agreements with Uhlig and to coerce the Uhlig Represented Communities to provide Community Information directly to PropLogix.

*Uhlig LLC d/b/a CondoCerts and d/b/a WelcomeLink v. PropLogix, LLC*, No. 2:22-cv-2475-KHV-ADM, Doc. 211 3d Am. Compl. (D. Kan. Dec. 20, 2023)

193.   The only ostensible alternative—the Manual Ordering Process—is designed to discourage its use. It requires wet-ink signatures on separate authorization forms for each request, payment by physical check or money order only, physical mailing of a complete

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims       Page 36 of 54**

"Order Package" to Kansas, a multi-step verification process, and if any errors or omissions are identified, restarting the entire process from the beginning. No rush processing is available. The process cannot feasibly be completed within the statutory timeframes governing the delivery of estoppel certificates, which are typically 10 to 15 business days. Uhlig's own Complaint acknowledges that this process is "rarely used" and represents "a negligible portion" of the Community Information managed by Uhlig. Doc. 1 Compl. ¶ 15. The Manual Ordering Process is a paper trail designed to look like an alternative while working as a dead end.

194.    Uhlig does not own the information for which it serves as gatekeeper. Uhlig has acknowledged in prior litigation that it "typically retains only a processing fee" and passes the balance of payment to its PMC clients. Uhlig describes itself as the "authorized representative" of its clients, an agent not a principal. Doc. 1 Compl. ¶¶ 9–10. The homeowners and associations own the information. State statutes require it to be produced. Uhlig has no more right to withhold that information than a courier has to refuse to deliver a package because the recipient might use a competing delivery service.

195.    Uhlig's conduct has caused concrete harm. Rexera has lost PMC relationships and revenue as a direct result of Uhlig's campaign. Title companies that rely on Rexera's services have been told by PMCs, using Uhlig's scripted language, that Rexera is "unauthorized", which is not true. This false narrative has caused transaction delays and business disruption affecting well over one thousand customer transactions that Rexera was engaged to process. Multiple PMCs have terminated their relationships with RealPage's HomeWiseDocs platform and moved their business to CondoCerts, with the departing PMCs expressly citing accusations of data misappropriation that originated with Uhlig's smear

campaign. Other PMCs have banned Rexera from contacting them due to CondoCerts' false narrative that Rexera is stealing data from the PMCs and HOAs.

## VII.    Uhlig's Scheme to Inflate the Acquisition Price

196.    Before filing this lawsuit, Uhlig and RealPage engaged in discussions regarding RealPage's potential acquisition of Uhlig's business. Uhlig rejected RealPage's final offer and demanded a purchase price approximately $85 million higher.

197.    When RealPage declined to increase its offer, Uhlig launched a three-pronged campaign of coercion designed to force RealPage to capitulate: (a) baseless claims of trade secret misappropriation and other misconduct, asserted for the purpose of imposing the burden and expense of litigation on RealPage and Rexera and creating a veneer of legitimacy for Uhlig's false accusations; (b) a coordinated disinformation campaign, described above, disseminating those false accusations to RealPage's and Rexera's customers, business partners, and industry contacts for the purpose of destroying their business relationships and poisoning their reputations; and (c) direct and implied threats communicated to RealPage that Uhlig would continue to escalate its campaign of reputational destruction— spreading increasingly damaging false accusations to an ever-wider audience—unless RealPage agreed to pay the inflated price Uhlig demanded.

198.    Uhlig's campaign to disseminate false accusations to PMCs, HOA boards, and industry participants—accusing RealPage and Rexera of data theft, trade secret misappropriation, and other serious misconduct—was designed to subject RealPage and Rexera to public ridicule, contempt, and degradation within their industry, and to coerce RealPage into paying an inflated acquisition price.

199.   Uhlig's scheme was designed to obtain something of value—specifically, tens of millions of dollars in additional acquisition consideration—by threatening to destroy RealPage's and Rexera's business through the dissemination of false and defamatory accusations to their customers and the industry at large.

200.   The campaign has achieved its intended effect. Over one thousand Rexera transactions have been disrupted, multiple RealPage customers have terminated their contracts and moved their business to CondoCerts, and multiple PMCs have banned Rexera from contacting them. The stated rationale traces back to the same false narrative: that Rexera and RealPage are stealing data from PMCs and HOAs.

## VIII.   Uhlig's Conduct Under Color of Statutory Obligation

201.   As alleged above, numerous state statutes impose mandatory obligations on HOAs and their authorized agents—including entities like Uhlig that contract with PMCs to process estoppel certificate requests—to produce closing documents to authorized requestors within specified timeframes. These statutes create a public right of access to HOA and condo association information in connection with real estate transactions.

- **Arizona.** Arizona provides multiple independent access pathways. A.R.S. § 33-1806(A) (planned communities) and § 33-1260 (condos) require the association to furnish a statement containing unpaid assessments to "a purchaser or a purchaser's authorized agent" upon request. A.R.S. §§ 33-1807(J) and 33-1256(J) separately require the association to furnish a lien estoppel statement to "a lienholder, escrow agent, member or person designated by a member." The lien estoppel statement "is binding on the association if the statement is requested by an escrow agency that is licensed pursuant to title 6, chapter 7." *Id.* Arizona thus provides express statutory access to purchasers' authorized agents, escrow agents, and persons designated by members—three independent pathways, each of which encompasses Rexera or its title company clients.

- **California.** Cal. Civ. Code § 4530(a)(1) requires delivery of specified transfer disclosure documents to "the owner of a separate interest, or any other recipient authorized by the owner." The "any other recipient authorized by the owner"

formulation encompasses any party the owner has authorized to receive closing documents—including a title company engaged to handle the closing and, by extension, the title company's agents performing closing-service functions. Under Cal. Civ. Code § 2319, an agent has authority "to do everything necessary or proper and usual, in the ordinary course of business, for effecting the purpose of his agency." Section 4530(a)(3) further provides that "[d]elivery of the documents required by this section shall not be withheld for any reason nor subject to any condition except the payment of the fee." Section 4530(c) authorizes associations to contract with "any person or entity" for compliance facilitation—permissive language that forecloses any claim of statutory exclusivity.

- **District of Columbia.** D.C. Code §§ 42-1903.13(h) and 42-1904.11(b) require the association to furnish an assessment statement or resale certificate to "[a]ny unit owner or purchaser." Under D.C. Code § 42-2018, "a purchaser, or a lender under a deed of trust, mortgage, or encumbrance, or parties designated by them" may request disclosure information. D.C.'s statutes expressly authorize requests from purchasers and, for older condominiums, from lenders and their designated parties.

- **Florida.** Florida Statutes §§ 720.30851 (HOA) and 718.116(8) (Condo) require the association to issue an estoppel certificate within ten business days of receiving a request from a parcel or unit owner, the owner's designee, a mortgagee, or the mortgagee's designee. Neither statute defines "designee" or limits who may serve in that capacity.

- **Georgia.** O.C.G.A. §§ 44-3-232(d) (HOA) and 44-3-109(d) (Condo) require the association to furnish a statement of unpaid assessments within five business days to a lot or unit owner, a mortgagee, a person having executed a contract for the purchase of the lot or unit, or a lender considering a loan secured by the lot or unit. Georgia's statute expressly authorizes requests from purchasers under contract and prospective lenders, categories that do not require any designation by the property owner. Failure to furnish the statement within five business days results in extinguishment of the association's lien as to the title acquired.

- **North Carolina.** N.C. Gen. Stat. §§ 47F-3-118(b) (Planned Community Act) and 47C-3-118(b) (Condominium Act) require the association to furnish a statement of unpaid assessments within ten business days to "the [lot/unit] owner or the [lot/unit] owner's authorized agents." A title company engaged by the owner to handle the closing is the owner's authorized agent for purposes of procuring the documents necessary to close the transaction, including the assessment statement. The title company's subagent performing that closing function—here, Rexera—acts within the chain of authority as one of the owner's "authorized agents."

- **Texas.** Texas provides two statutory frameworks governing estoppel certificates and resale certificates for different community types. For HOA communities,

Texas Property Code § 207.003(a) requires the association to furnish a resale certificate within 10 business days to any of six expressly enumerated categories: (1) the property owner, (2) the owner's agent, (3) the purchaser, (4) the purchaser's agent, (5) a title insurance company, or (6) an agent of a title insurance company acting on behalf of the owner or purchaser. For condominium communities, Texas Property Code § 82.157(b) requires the association to furnish a resale certificate within ten days to "the selling unit owner or the owner's agent." The term "the owner's agent" is undefined. A title company engaged by the owner to handle the closing is the owner's agent for purposes of procuring the documents necessary to close the transaction, and Rexera, as the title company's subagent performing that closing function, acts within the scope of "the owner's agent."

202. Each of these statutes reflects the same legislative judgment: The information contained in estoppel certificates and assessment statements is essential to facilitating real estate transactions. Access to that information must not be obstructed so that the real estate market can operate efficiently and on schedule. The statutes impose short deadlines of just a few days, prescribe penalties for noncompliance (including lien extinguishment and civil penalties), and in several cases make the statement binding on the HOA or condo association. None of these statutes authorizes a single private entity to serve as the exclusive conduit for statutory compliance.

203. Rexera acts within each of these statutory frameworks as an agent of the title company, lender, homeowner, or buyer, depending on the type of underlying transaction and the state where the property is located. The specific statutory category under which Rexera qualifies as an authorized requestor in each state is identified in ¶¶ 201–202 above.

204. Uhlig occupies a unique position in this statutory framework. By contracting with PMCs to serve as the exclusive processor of estoppel certificate requests, Uhlig has assumed the statutory obligations of the associations it represents. But Uhlig does not honor those obligations. Instead, it conditions the delivery of statutorily required documents on

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims**      **Page 41 of 54**

compliance with its own Terms of Use and refuses to deliver documents to authorized requestors who do not accept those terms. When Uhlig refuses to process a request from an authorized requestor, it is not merely exercising a private contractual right; it is obstructing the statutory mechanism through which homeowners, buyers, lenders, and title companies obtain information the law requires to be produced.

205.    Uhlig has used its statutory gatekeeper position to cut off Rexera's access, direct its PMC partners to refuse alternative requests, and coerce RealPage into paying an inflated acquisition price.

COUNT I: DECLARATORY JUDGMENT

206.    Defendants reallege and incorporate by reference all preceding counterclaim allegations as though fully set forth herein.

207.    An actual, justiciable controversy exists between the parties regarding: (a) whether Rexera has the right to access estoppel certificates and assessment statements as an authorized requestor under the statutes of Arizona, California, the District of Columbia, Florida, Georgia, North Carolina, and Texas; (b) whether Uhlig's exclusive-dealing arrangements and User Agreement restrictions unlawfully foreclose access by authorized requestors to statutorily mandated disclosures; and (c) whether Uhlig, as the authorized agent of HOAs and PMCs, assumed the statutory obligations those associations bear, including the obligation to deliver estoppel certificates to authorized requestors within the timeframes mandated by statute.

208.    Under the Declaratory Judgment Act, 28 U.S.C. § 2201, Defendants are entitled to a declaration that:

- Rexera, when acting on behalf of a parcel owner, mortgagee, purchaser, lender, title company, or their agents in connection with a specific real estate transaction, qualifies as an authorized requestor under:

  (i) Florida Statutes §§ 720.30851 and 718.116(8), as a designee of the parcel or unit owner or mortgagee;

  (ii) Texas Property Code § 207.003(a), as an agent of a title insurance company acting on behalf of the owner or purchaser, or as a purchaser's agent, and Texas Property Code § 82.157(b), as the owner's agent or as a subagent of the title company acting as the owner's closing agent;

  (iii) O.C.G.A. §§ 44-3-232(d) and 44-3-109(d), as an agent of a person having executed a contract for the purchase of the property or of a lender considering a loan secured by the property;

  (iv) A.R.S. §§ 33-1806(A), 33-1807(J), 33-1260, and 33-1256(J), as a purchaser's authorized agent, the agent of a licensed escrow agent, or a person designated by a member;

  (v) D.C. Code §§ 42-1903.13(h), 42-1904.11(b), and 42-2018, as an agent of a purchaser or of a lender or parties designated by them;

  (vi) Cal. Civ. Code § 4530(a)(1), as a recipient authorized by the owner or as a subagent of the title company acting as the owner's authorized closing agent; and

  (vii) N.C. Gen. Stat. §§ 47F-3-118(b) and 47C-3-118(b), as one of the lot or unit owner's authorized agents, acting through the title company engaged by the owner to handle the closing;

- Uhlig's User Agreements, to the extent they purport to prohibit authorized designees from accessing statutorily mandated information, are illegal and unenforceable as contrary to public policy and state laws requiring access to the information;

- Uhlig's Section 2.2(f) exclusivity clause, which requires PMCs to process "substantially all" estoppel certificate transactions through the CondoCerts platform, cannot override the statutory rights of authorized requestors under the statutes enumerated above; and

- Uhlig, as the authorized agent of HOAs and PMCs, is subject to the same statutory obligations as the associations it represents, including the obligation to produce estoppel certificates to authorized designees within the timeframes mandated by statute.

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims**      **Page 43 of 54**

209.   This controversy is ripe for adjudication. The resolution of this question will determine the rights and obligations of the parties going forward and will affect the broader industry.

## COUNT II: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS

210.   Defendants reallege and incorporate by reference all preceding counterclaim allegations as though fully set forth herein.

211.   Rexera had existing and prospective business relationships with PMCs, HOA boards, title companies, and lenders across the United States. These relationships were known to Uhlig. Uhlig occupies the intermediary position between PMCs and entities like Rexera, and has direct knowledge of which companies order estoppel certificates through its platform.

212.   Uhlig intentionally interfered with Rexera's business relationships through a coordinated campaign that included: (a) seeding a false narrative through sales relationships and industry events characterizing Rexera's lawful activity as unauthorized or illicit; (b) providing PMCs with scripted language to reject Rexera's document requests; and (c) leveraging its exclusive contracts to coerce PMCs into refusing to deal with Rexera.

213.   Uhlig's interference caused actual harm to Rexera's and RealPage's business relationships. Young Management terminated its relationship with Rexera effective April 19, 2026, citing concerns directly traceable to Uhlig's narrative and allegations. Trident Management refused to process Rexera's document requests using language that tracked Uhlig's litigation talking points. Industry contacts reported that CondoCerts representatives

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims          Page 44 of 54**

were falsely characterizing Rexera's access as unauthorized, in an effort to poison Rexera and RealPage's reputation in the market. Multiple other PMCs terminated their contracts with RealPage's HomeWiseDocs platform and moved their business to CondoCerts, with the departing PMCs citing the false accusations of data misappropriation that Uhlig had disseminated. In some cases, the departing customers were simply repeating false information that they had learned from CondoCerts or its agents. In total, Uhlig's conduct has interfered with well over one thousand customer transactions that Rexera was engaged to process, causing delays, increased costs, and disruption to homeowners, title companies, and other transaction participants.

214.   Uhlig's conduct was improper. Uhlig orchestrated a campaign of disinformation through third parties, using a plausible deniability architecture in which the narrative was seeded through sales relationships and laundered through word-of-mouth rumors so the source was obscured. Uhlig's interference was motivated not by the protection of legitimate contractual interests but by a desire to maintain control over the electronic processing of estoppel certificates, to poach RealPage's customers for the benefit of CondoCerts, and to inflate the purchase price that RealPage would pay to acquire Uhlig's business.

215.   As a direct and proximate result of Uhlig's tortious interference, Rexera and RealPage have suffered damages including lost business relationships, lost revenue, lost customers who moved their business to CondoCerts, reputational harm, disruption of over one thousand customer transactions, and increased costs of operations, in amounts to be proven at trial.

**COUNT III: UNFAIR AND DECEPTIVE TRADE PRACTICES (N.C. GEN. STAT. § 75-1.1)**

216.    Defendants reallege and incorporate by reference all preceding counterclaim allegations as though fully set forth herein.

217.    North Carolina law governs this claim. Uhlig's anticompetitive conduct caused injury to Rexera's and RealPage's business in North Carolina, where Rexera processed approximately 998 transactions through the CondoCerts platform. The CondoCerts Terms of Use choice-of-law clause does not extend to these claims, which arise from independent statutory duties and extracontractual conduct—not from the CondoCerts terms of service relationship.

218.    Uhlig engaged in unfair methods of competition and unfair acts or practices in or affecting commerce in violation of N.C. Gen. Stat. § 75-1.1. Uhlig's conduct is immoral, unethical, oppressive, and substantially injurious. Specifically, Uhlig (a) imposed contracts requiring PMCs to route "substantially all" estoppel certificate transactions through CondoCerts and prohibiting the PMCs and the HOAs they represent from delivering those documents to authorized requestors through any other channel; (b) orchestrated a coordinated disinformation campaign through cooperating PMCs, disseminating false accusations of data theft and trade secret misappropriation to Rexera's and RealPage's customers; (c) used serial litigation as a weapon, filing four (now five) federal lawsuits in five years, each represented by the same counsel, and resolving every one before any court could test the legality of its business model; and (d) maintained a commercially unviable Manual Ordering Process designed to function as a dead end rather than a genuine alternative to electronic access.

219.    Uhlig also engaged in deceptive acts or practices having the capacity or tendency to deceive. Beginning on or about March 19, 2026, Uhlig or its agents transmitted

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims          Page 46 of 54**

electronic communications to PMCs and industry participants containing false statements that Rexera was "not an authorized party" to transactions and was "taking CondoCerts data and claiming it as their own." These statements were false because Rexera was an authorized requestor under applicable state statutes, paid Uhlig's full asking price for every document ordered, and did not misrepresent Uhlig's data as its own. Uhlig made these false statements for the purpose of diverting Rexera's customers to CondoCerts and coercing RealPage into paying an inflated acquisition price.

220.    Rexera's claims under this Count are not based on any breach of the CondoCerts Terms of Service. They are based on Uhlig's independent conduct: contracts that prevent PMCs and HOAs from honoring statutory delivery obligations, a disinformation campaign directed at third parties, and serial litigation to deter use of any non-CondoCerts channel. Each gives rise to duties imposed by law, independent of any contract between Uhlig and Rexera.

221.    Uhlig's conduct occurred in or affecting commerce as defined by N.C. Gen. Stat. § 75-1.1(b). Rexera processed approximately 998 transactions through the CondoCerts platform involving North Carolina properties. As a direct and proximate result of Uhlig's unfair and deceptive conduct, Rexera and RealPage have suffered actual injury, including lost revenue from North Carolina transactions, lost customer relationships, and reputational harm, in amounts to be proven at trial.

222.    Pursuant to N.C. Gen. Stat. § 75-16, Defendants are entitled to recover mandatory treble damages. Defendants further seek attorneys' fees under N.C. Gen. Stat. § 75-16.1.

### COUNT IV: UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200)

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims          Page 47 of 54**

223. Defendants reallege and incorporate by reference all preceding counterclaim allegations as though fully set forth herein.

224. California law governs this claim because Uhlig's conduct caused injury to Rexera's and RealPage's business in California, where Rexera processed approximately 806 transactions through the CondoCerts platform. For the reasons stated in Count III, the CondoCerts Terms of Use choice-of-law clause does not extend to these claims.

225. Uhlig's conduct constitutes "unlawful" business practices under the UCL. The UCL borrows violations of other laws as predicates for independent liability. California Civil Code § 4530(a)(3) prohibits conditioning the delivery of association records on anything other than payment of a fee. Uhlig's exclusive-dealing contracts and platform restrictions condition delivery of estoppel certificates on compliance with Uhlig's contractual demands, in violation of Section 4530(a)(3). This statutory violation constitutes an independently actionable unlawful business practice.

226. Uhlig's conduct also constitutes "unfair" business practices. Uhlig's contracts and litigation impose substantial harm on consumers and competition. The contracts require PMCs to route "substantially all" transactions through CondoCerts and prohibit the PMCs and the HOAs they represent from delivering those documents through any other channel—even to authorized requestors holding statutory rights of access. Uhlig deters use of any other channel through serial litigation. The combined effect creates barriers to entry and forecloses delivery of estoppel certificates by any provider for properties managed by Uhlig-contracted PMCs.

227. Uhlig's conduct further constitutes "fraudulent" business practices. Beginning at least on or about March 19, 2026, Uhlig or its agents transmitted communications to PMCs,

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims**      **Page 48 of 54**

HOA boards, and industry participants containing false statements that Rexera was "not an authorized party" to transactions and was "taking CondoCerts data and claiming it as their own." These statements were transmitted through electronic communications to PMCs (including the scripted refusal from Trident Management on March 19, 2026), through termination notices from PMCs to RealPage (including Young Management's March 20, 2026 termination of its HomeWiseDocs contract), and through in-person communications at industry meetings and conferences. These statements were likely to deceive members of the relevant public into believing that Rexera's lawful business activities were unauthorized and illicit.

228.   Rexera processed approximately 806 transactions through the CondoCerts platform involving California properties. As a direct result of Uhlig's unfair competition, Defendants seek injunctive relief prohibiting Uhlig from continuing its unlawful, unfair, and fraudulent business practices, and restitution of amounts wrongfully obtained. Cal. Bus. & Prof. Code § 17203.

**COUNT V: DECEPTIVE AND UNFAIR TRADE PRACTICES (FLA. STAT. § 501.204)**

229.   Defendants reallege and incorporate by reference all preceding counterclaim allegations as though fully set forth herein.

230.   Florida law governs this claim. Uhlig conceded in prior litigation in this District that Florida law governs FDUTPA claims arising from the same CondoCerts platform and the same Terms of Use at issue here. *See Uhlig LLC v. PropLogix, LLC*, No. 2:22-cv-2475-KHV-ADM, Doc. 320 Pls's Mem. Supp. Mot. Partial Summ. J. at 36 n.15 (D. Kan. Apr. 5, 2024) ("The parties agree this claim is governed by the laws of the State of Florida."). That concession is directly on point and binding on Uhlig's position here.

231.    Uhlig engaged in unfair practices in the conduct of trade or commerce in violation of Fla. Stat. § 501.204. Uhlig's conduct causes or is likely to cause substantial injury: inflated fees passed through to homeowners across 3,852 Florida transactions, delayed real estate closings with concrete monetary costs including rate-lock expirations and per diem charges, and denial of timely estoppel certificates to homeowners who authorize designees. The injury is not reasonably avoidable by consumers. Homeowners do not select the estoppel certificate provider. PMCs are bound by Uhlig's contracts to route documents through CondoCerts and to refuse delivery through any other channel. And homeowners learn about fees and channels only at or near closing, when the transaction is committed. The injury is not outweighed by countervailing benefits. Uhlig's contracts override the associations' statutory delivery obligations and provide no consumer benefit in the form of improved service, lower prices, or enhanced quality.

232.    Uhlig also engaged in deceptive acts in the conduct of trade or commerce. Beginning on or about March 19, 2026, Uhlig or its agents transmitted electronic communications to PMCs and industry participants containing representations that Rexera was "not an authorized party" to transactions and was "taking CondoCerts data and claiming it as their own." These representations were objectively misleading because Rexera was an authorized requestor under applicable state statutes, paid Uhlig's full asking price for every document ordered, and did not misrepresent Uhlig's data as its own. Uhlig made these representations to divert Rexera's customers to CondoCerts and to coerce RealPage into paying an inflated acquisition price.

233.    Uhlig's unfair and deceptive practices have caused injury and detriment to consumers. Homeowners in Florida who authorize designees to obtain estoppel certificates

have experienced delayed closings, inflated fees, restricted access to statutorily mandated information, and reduced choice among service providers. These consumer harms are structural. They arise from Uhlig's contractual architecture, which prohibits PMCs and HOAs from delivering estoppel certificates through any channel except CondoCerts and on Uhlig's terms.

234.    Rexera processed approximately 4,106 transactions through the CondoCerts platform involving Florida properties—the highest volume of any state. As a direct and proximate result of Uhlig's deceptive and unfair practices, Defendants have suffered actual damages including lost revenue, lost customer relationships, and reputational harm, in amounts to be proven at trial. Defendants seek actual damages under Fla. Stat. § 501.211(2), injunctive relief under Fla. Stat. § 501.211(1), and attorneys' fees and costs under Fla. Stat. § 501.2105.

### RESERVATION TO ASSERT ADDITIONAL CLAIMS

235.    Defendants reserve the right to assert additional claims, including, but not limited to, claims under federal and state antitrust statutes, state unfair-competition statutes, or other applicable law, as may become appropriate based on facts developed through discovery.

### JURY DEMAND

236.    Defendants demand a trial by jury on all issues and claims triable to a jury.

### PRAYER FOR RELIEF

Defendants and Counterclaim Plaintiffs RealPage, Inc. and TOMTE, LLC d/b/a Rexera respectfully pray for judgment as follows:

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims          Page 51 of 54**

- Dismissing Uhlig's Complaint with prejudice and denying Uhlig all relief sought therein;

- On the First Count in Defendants' Counterclaim, entering a declaratory judgment that: (a) Rexera has the right to access estoppel certificates as an authorized requestor under applicable state statutes; (b) Uhlig's User Agreements are unenforceable to the extent they foreclose access by authorized requestors to statutorily mandated disclosures; and (c) Uhlig is subject to statutory obligations to produce estoppel certificates to authorized designees;

- On the Second, Third, and Fifth Counts in Defendants' Counterclaim, entering judgment in favor of Defendants and against Uhlig for compensatory damages in an amount to be proven at trial, including lost revenue, lost business relationships, lost customers, reputational harm, and disruption of over one thousand customer transactions;

- On the Third Count in Defendants' Counterclaim, entering judgment in favor of Defendants and against Uhlig for treble the amount of damages sustained pursuant to N.C. Gen. Stat. § 75-16, together with attorneys' fees under N.C. Gen. Stat. § 75-16.1;

- On the Fourth Count in Defendants' Counterclaim, entering injunctive relief prohibiting Uhlig's unlawful, unfair, and fraudulent business practices, and restitution of amounts wrongfully obtained, pursuant to Cal. Bus. & Prof. Code § 17203;

- On the Fifth Count in Defendants' Counterclaim, entering judgment in favor of Defendants and against Uhlig for actual damages, injunctive relief, and attorneys' fees and costs pursuant to Fla. Stat. §§ 501.211, 501.2105;

- Awarding Defendants their costs and reasonable attorney's fees as permitted by applicable law;

- Awarding pre-judgment and post-judgment interest; and

- Granting such other and further relief to which Defendants/Counter-Plaintiffs may be entitled.

Respectfully submitted,

**REESE MARKETOS LLP**

*/s/ Pete D. Marketos*

**Defendants/Counter-Plaintiffs' Original Answer and Counterclaims**      **Page 52 of 54**

Pete D. Marketos (*pro hac vice* forthcoming)
Texas State Bar No. 24013101
pete.marketos@rm-firm.com
Brett S. Rosenthal (*pro hac vice* forthcoming)
Texas State Bar No. 24080096
brett.rosenthal@rm-firm.com
Bradley M. Gordon (*pro hac vice* forthcoming)
Texas State Bar No. 00784150
brad.gordon@rm-firm.com
Jamison M. Joiner (*pro hac vice* forthcoming)
Texas State Bar No. 24093775
jamison.joiner@rm-firm.com

750 N. Saint Paul St., Suite 600
Dallas, Texas 75201-3201
214.382.9810 telephone
214.501.0731 facsimile

*/s/ Michael T. Raupp*
Michael T. Raupp, KS Bar No. 25831
Mitchell J. Perne, KS Bar No. 31102
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080
michael.raupp@huschblackwell.com
mitchell.perne@huschblackwell.com

*Counsel for Defendants/Counter-Plaintiffs*
*RealPage, Inc. and TOMTE, LLC d/b/a Rexera*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 24, 2026, I filed the foregoing document via the Court's ECF system, which will cause a true and correct copy of the same to be served electronically on all ECF-registered counsel of record.

*/s/ Michael T. Raupp*
*Counsel for Defendants/Counter-Plaintiffs*
*RealPage, Inc. and TOMTE, LLC d/b/a Rexera*