**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| UHLIG LLC d/b/a CONDOCERTS and d/b/a WELCOMELINK, | § § § | |
| Plaintiff/Counter-Defendant, | § § | JURY TRIAL DEMANDED |
| v. | § § | |
| | § | Case No. 2:26-cv-02144-TC-ADM |
| REALPAGE, INC., TOMTE, LLC d/b/a REXERA, and NEXTLEVEL ASSOCIATION SOLUTIONS, INC. d/b/a HOMEWISEDOCS | § § § § § | |
| | § | |
| Defendants/Counter-Plaintiffs. | § | |

**DEFENDANTS/COUNTER-PLAINTIFFS'
<u>AMENDED COUNTERCLAIMS AND ANSWER TO AMENDED COMPLAINT</u>**

Defendants RealPage, Inc. ("RealPage"), TOMTE LLC d/b/a Rexera ("Rexera"),

and Nextlevel Association Solutions, Inc. d/b/a HomeWiseDocs ("HWD," and together

with RealPage and Rexera, "Defendants" or "Counter-Plaintiffs") file these Amended

Counterclaims and Answer to the Amended Complaint filed by Plaintiff Uhlig LLC

("Uhlig," "Plaintiff," or "Counter-Defendant"). For clarity and to avoid redundancy, the

Amended Counterclaims are presented first. The numbered paragraphs in the Answer

section below correspond to those in Plaintiff's Amended Complaint.

## AMENDED COUNTERCLAIMS

1. This case is not about protecting any of Uhlig's legitimate legal rights. It is about Uhlig's unfair competition and leverage play. Uhlig was in talks with RealPage about a potential sale of Uhlig's business and demanded approximately $85 million more for CondoCerts than its fair market value warrants. RealPage declined.

2. Uhlig filed this lawsuit just days after RealPage rejected Uhlig's unreasonable acquisition demand, and then in violation of state and federal law, Uhlig launched a coordinated campaign of disinformation, reputational destruction, unfair exclusion, and commercial coercion directed at RealPage and its affiliates.

3. Uhlig threatens to destroy RealPage's, Rexera's, and HWD's business relationships, poison their reputations in the industry, and inflict maximum commercial harm unless RealPage pays Uhlig's acquisition demand. The campaign has already disrupted over 1,000 Rexera transactions, caused at least 30 customers covering over 363,000 units to terminate their relationships with HWD, and harmed RealPage's market reputation and position. Several departing customers parroted the false accusations Uhlig disseminated as the reason for their departure.

4. In some cases, the departing customers moved their business directly to Uhlig's own companies, the very source of the misinformation.

5. The law provides remedies for what Uhlig has done. Defendants counterclaim for a declaratory judgment that Rexera is entitled to fair access via the CondoCerts platform to the public estoppel-certificate information that Uhlig maintains for HOAs and PMCs but does not own, as well as claims for damages for tortious interference, unfair competition, and deceptive trade practices under the Lanham Act and applicable state law.

## PARTIES

6.     Counter-Plaintiff RealPage, Inc. is a corporation organized under the laws of the State of Delaware with its principal place of business at 2201 Lakeside Blvd., Richardson, Texas 75082.

7.     Counter-Plaintiff TOMTE, LLC d/b/a Rexera is a limited liability company organized under the laws of the State of Delaware. On or about July 29, 2025, RealPage closed on its transaction through which it acquired Rexera.

8.     Counter-Plaintiff Nextlevel Association Solutions, Inc. d/b/a HomeWiseDocs is a corporation organized under the laws of the State of California with its principal place of business at 2201 Lakeside Boulevard, Richardson, Texas 75082.

9.     Counter-Defendant Uhlig LLC d/b/a CondoCerts and d/b/a WelcomeLink is a Delaware limited liability company with its principal place of business at 8455 Lenexa Drive, Overland Park, Kansas 66214. Uhlig has appeared in this case and may be served with this counterclaim through its counsel of record.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over these counterclaims under 28 U.S.C. § 1331 and 28 U.S.C. § 1367 because the counterclaims arise out of the same transactions or occurrences as Uhlig's claims.

11.     Venue is proper in this Court under 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

**I.     The Disclosure Documents Industry**

12.    A set of documents that disclose the financial obligations, legal restrictions, and assessments associated with a residential property in a common interest community (collectively, "disclosure documents") are required for the purchase, sale, financing, and refinancing of real estate in these communities. The information in these disclosure documents is maintained by homeowners associations ("HOAs") for each community and their respective property management companies (often referred to as "PMCs").

13.    The laws of many states mandate that HOAs produce disclosure documents to authorized requestors within specified timeframes. For instance, Florida Statutes Sections 720.30851 and 718.116(8) require associations to issue disclosure documents "[w]ithin 10 business days after receiving a written or electronic request" from "a parcel owner or the parcel owner's designee, or a parcel mortgagee or the parcel mortgagee's designee." While details vary, most states have similar legal requirements.

14.    These state statutes generally use broad terms—such as designee, authorized agent, or representative—to describe who can request documents. And generally, the only requirement to obtain documents is payment of a statutorily capped fee. State laws generally forbid private actors like Uhlig from imposing additional, extra-statutory requirements to obtain documents. *See, e.g.*, Cal. Civ. Code § 4530(a)(3) ("Delivery of the documents required by this section shall not be withheld for any reason nor subject to any condition except the payment of the fee authorized pursuant to subdivision (b).").

## II.   Uhlig's Role as Gatekeeper for Its Customers' Disclosure Documents

15.   Uhlig operates the CondoCerts and WelcomeLink platforms, which are two widely-used electronic channels for ordering disclosure documents from HOAs and PMCs across the United States. Uhlig enters into contracts with the PMCs and HOAs pursuant to which Uhlig is responsible for providing disclosure documents to requesting parties.

16.    Uhlig's standard contract requires PMCs and HOAs to "use [Uhlig's] Resale Service for substantially all transactions involving the Enrolled Units." Thus, Uhlig forbids its PMC and HOA customers from delivering disclosure documents to anyone except through CondoCerts or WelcomeLink, on Uhlig's self-serving terms.

17.   The effect: CondoCerts and WelcomeLink are the only channel through which disclosure documents may be delivered from PMCs and HOAs that contract with Uhlig. Uhlig uses this contractual architecture to position itself as the sole gatekeeper of information that *state laws require to* be produced.

18.   But Uhlig does not own the information for which it serves as gatekeeper. Uhlig has acknowledged in prior litigation that it "typically retains only a processing fee" and passes the balance of payment to its clients. Uhlig describes itself as the "authorized representative" of its clients. Doc. 32 Am. Compl. ¶¶ 13–14. The homeowners and associations own the information.

19.   Exclusive contracts are not *per se* improper. An exclusive contract between a vendor and a PMC could be permissible if documents are delivered in accordance with state law. For instance, a provision that restricted a PMC from retaining multiple companies to provide electronic access to documents would likely be permissible.

**Defendant/Counter-Plaintiffs' Amended**
**Counterclaims and Answer to Amended Complaint**                     Page 5 of 69

20.    Uhlig's contracts, however, restrict PMCs and HOAs from providing disclosure documents through any means other than Uhlig, even when Uhlig itself refuses to provide the documents. That means not only that the PMCs and HOAs cannot hire other companies, but also that they themselves cannot provide the documents directly—even when the law requires that they do so.

21.    Uhlig's only alternative to electronic access is its so-called "Manual Ordering Process." The Manual Ordering Process requires, among other things: (a) the use of separate written authorization forms for each document request, bearing an original signature "separately executed" by the owner, mortgagee, or buyer; (b) the completion of a "Manual Order Pre-Submission Form"; (c) emailing PDFs of the completed documents, each with wet-ink signatures, to a CondoCerts email address; (d) awaiting "necessary order instructions" and delivery of an "order form" from CondoCerts; (e) completing the order form and other forms provided by CondoCerts, as well as providing "additional supporting documentation required by the Order Package checklist"; (f) making payment via "check or money order ONLY payable to CondoCerts"; (g) completing the above requirements separately as to each "single parcel/unit with a single payment"; (h) mailing the completed Order Package to CondoCerts' physical address in Kansas via hand delivery, USPS First-Class Mail, or overnight courier; (i) awaiting CondoCerts' confirmation and verification of the Order Package; (j) addressing any "errors or omissions identified by CondoCerts"; (k) after verification is complete, awaiting "processing" by CondoCerts of the order; and (l) if any changes are required to the order, restarting the entire process from the beginning. No rush processing is available under the Manual Ordering Process.

22.     The Manual Ordering Process is not commercially viable. Real estate closings operate on tight deadlines, typically measured in days. Delay can yield costly consequences for homeowners whose closing stall, title companies that scramble for workarounds, and lenders whose rate locks expire. State statutes generally require disclosure documents to be produced within days of a request. The Manual Ordering Process—with, among other things, its requirement of physical mailing to Kansas, payment by check or money order, multi-step verification, wet-ink signature requirements, the possibility of having to restart the entire process if any purported errors or omissions are identified, and lack of availability of rush processing—cannot feasibly be completed within these statutory timeframes.

23.     The process is a paper trail designed to look like an alternative while functioning practically as a dead end. Indeed, in March 2026, Uhlig's principal Mark Uhlig told RealPage executive Sean Leaver over the phone that the Manual Ordering Process was designed to be "commercially unviable."

24.     Uhlig's own Complaint admits that the manual process is "limited to specific documents or services, if any, that may be ordered" and acknowledges that it is "rarely used" and "represents a negligible portion" of the Community Information managed by Uhlig. Doc. 32 Am. Compl. ¶ 23.

### III.     Rexera's Business and Its Relationship with Uhlig

25.     Rexera provides document-retrieval and closing-coordination services to title companies, lenders, and other participants in real estate transactions. Rexera's customers hire Rexera to conduct lien searches and obtain disclosure documents and other closing documents required for the purchase, sale, and financing of residential real estate.

26.     When a title company or lender hires Rexera for a closing, Rexera identifies whether the property is in an HOA or condominium community, locates the party that holds the community's disclosure documents (sometimes the association itself, sometimes a property management company, sometimes a platform like CondoCerts), requests the disclosure document and any other required documents, pays the association's fee, and delivers the documents on the closing timeline.

27.     Rexera uses proprietary technology, including agentic AI, to perform document-retrieval services at scale. Rexera's AI agents operate under contractual authority from Rexera's clients and access platforms the way a human user would: through the published web interface, performing the same actions a human user would perform to find a property, place an order, and track it through delivery.

28.     Rexera acts as an agent of its title company and lender customers, who in turn act on behalf of homeowners and mortgagees in specific real estate transactions. In a typical Rexera transaction, the chain of authority runs from the homeowner or mortgagee to the title company to Rexera. In some cases, Rexera is directly authorized by the homeowner or mortgagee. In any event, Rexera orders the disclosure document for a specific property, in connection with a specific closing, on behalf of a specific client. And contrary to Uhlig's allegations, Rexera does not scrape, crawl, or harvest data.

29.     Rexera paid Uhlig's full asking price for every disclosure document it ordered. Uhlig received the same revenue per transaction from Rexera that it would have received from any other customer. Since 2022, Rexera has placed over 13,000 orders on Uhlig's portals and paid Uhlig more than $3.5 million.

30.    Rexera charges its customers a service fee for its facilitation services, including research, ordering, tracking, quality review, and delivery. This fee compensates Rexera for its service. Rexera does not "resell" disclosure documents. As Uhlig's own Terms of Use acknowledge, authorized users may charge their "client or customer" for "reimbursement for charges" in connection with "the specific order." This is exactly what Rexera does; clients are invoiced on a passthrough basis for Uhlig's fees.

## IV.    RealPage's Acquisition of Rexera and Discussions with Uhlig About CondoCerts

31.    On or about July 29, 2025, RealPage acquired Rexera. RealPage also owns HWD, a platform that competes against CondoCerts in the business of maintaining and providing disclosure documents for HOA and PMC customers.

32.    In September 2025, Uhlig contacted RealPage about Rexera's use of the CondoCerts platform. On October 1, 2025, Uhlig sent a nine-page cease-and-desist letter with a draft complaint attached and demanded compliance within 48 hours.

33.    On or about October 6–7, 2025, the parties executed a mutual covenant not to sue, and Uhlig expressed interest in a commercial resolution pursuant to which RealPage would acquire Uhlig's CondoCerts business.

34.    RealPage and Uhlig engaged in a series of discussions over the following months. Those efforts failed in part because Uhlig demanded that RealPage pay $85 million over fair market value for CondoCerts. RealPage declined, as discussed below.

35.    Shortly after RealPage declined Uhlig's inflated offer, on March 11, 2026, Uhlig sent a letter formally revoking the covenant not to sue and terminating Rexera's access to the CondoCerts platform, effective March 13, 2026.

36.     Before Uhlig filed this lawsuit, RealPage proposed a transparent, monitored designee-access arrangement through which Rexera would access disclosure documents under a documented protocol with full visibility to Uhlig. Although this proposal should have addressed any legitimate concerns, Uhlig rejected that proposal.

## V.     Uhlig's Disinformation Campaign Against RealPage and Its Affiliates

37.     After filing this lawsuit on March 13, 2026, Uhlig launched a coordinated campaign to poison RealPage, Rexera, and HWD's relationships with PMCs, HOA boards, title companies, and other industry participants.

38.     Uhlig spread false rumors that RealPage and its affiliates had engaged in data theft, trade secret misappropriation, and other misconduct. Uhlig's dissemination of these false rumors was intended to harm RealPage, Rexera, and HWD's reputation and undermine their relationships with customers.

39.     Although Counter-Plaintiffs were not directly privy to the dissemination of these false rumors, they know about them because they felt the backlash.

40.     For example, on March 19, 2026, a PMC sent Rexera a message in response to a routine document request. The message parroted Uhlig's litigation allegations nearly verbatim, falsely asserting that Rexera is "not an authorized party to the transaction" and referencing CondoCerts' "recent communication and legal filings."

41.     On March 20, 2026, another PMC sent RealPage formal notice of termination of its contract with HWD so that the PMC could move its business to CondoCerts. The PMC then made discovery-type requests for information and documents concerning the relationship between HWD and Rexera. On information and belief, in light

of the timing and substance of the communication (including the fact that the customer was moving to CondoCerts and the request for information that closely relates to Uhlig's false allegations), the customer's decision to terminate its agreement with HWD resulted from false information it had received from Uhlig.

42.    On or about April 6, 2026, another PMC customer terminated its relationship with HWD. In terminating the relationship with HWD, the customer stated that a CondoCerts representative had told her, falsely, that HWD "profits from reselling PMC data." The customer also showed a flyer, apparently prepared and distributed broadly to industry participants by Uhlig, that reiterated the same false message.

43.    Another PMC customer said that a CondoCerts representative had stopped by their office and left materials, including a flyer that frames HWD as not handling "sensitive data" properly and offering a switch-over promotion to CondoCerts.

44.    Another PMC customer gave notice that they planned to migrate their business from HWD to WelcomeLink, one of Uhlig's companies, effective May 1, 2026. The customer stated that the decision was driven largely by false messaging they had received from a CondoCerts representative to the effect that HWD was "poaching" revenue from PMC customers by misappropriating data.

45.    In or around March 26, 2026, another HWD customer stated that CondoCerts was pressuring the customer to migrate its business from HWD to CondoCerts based on the false allegation that HWD was improperly "reselling" the customers' data.

46.    Uhlig's deceptive disparagement campaign has directly impacted Rexera. For example, in or around March 16, 2026, a PMC wrote that "CondoCerts has formally

**Defendant/Counter-Plaintiffs' Amended**
**Counterclaims and Answer to Amended Complaint**                    Page 11 of 69

notified us that certain entities, including Rexera, no longer have access to their online ordering system due to issues outlined in their recent communication and legal filings." This message indicates that the PMC had received false information about Rexera's business activities from CondoCerts in recent communications.

47.    Counter-Plaintiffs have learned of multiple other instances of PMCs and other industry participants having been fed CondoCerts talking points by Uhlig (for instance, one reported that they heard that Rexera is "taking CondoCerts data and claiming it as their own") in private communications and at industry meetings and conferences. The intended effect was clear—as one customer wrote based on false information disseminated by Uhlig that they received, companies "should not be dealing with Rexera" and "HWD/RealPage is under big fire for this."

48.    Uhlig's unlawful disinformation-and-disparagement campaign against Counter-Plaintiffs operated through three main channels: Uhlig-scripted refusals to engage from PMCs when Rexera tried to interact with them directly to obtain disclosure documents, contract terminations driven by Uhlig-planted narratives, and industry-event disinformation about purported misconduct that sullied the reputations of Rexera, RealPage, and HWD. Each is documented through independent sources.

49.    Uhlig has also used the smear campaign to poach RealPage's customers. Several PMCs that were customers of HWD have terminated their contracts with HWD and moved their business to its competitor, Uhlig's own CondoCerts. Some of these departing customers expressly cited the false accusations disseminated by Uhlig—including

accusations that RealPage and its affiliates were misappropriating data from PMCs and HOAs—as the primary reason for their departure.

## VI.   Uhlig's Exclusion of Rexera from the CondoCerts Platform

50.   Uhlig has also interfered with Rexera's ability to serve its customers by barring Rexera from using the CondoCerts platform to obtain disclosure documents.

51.   As explained above, Uhlig's contracts with its customers require that Uhlig—and Uhlig alone—provide disclosure documents and other documents to third parties that request the documents in connection with potential transactions.

52.   Uhlig has unfairly leveraged its gatekeeper role over these documents by refusing to allow Rexera to use the CondoCerts platform to obtain documents on behalf of Rexera's customers who need the documents to complete transactions, even though state law in most States requires that the documents be provided.

53.   Rather than allowing Rexera to use the CondoCerts platform, Uhlig has required Rexera to request documents via the so-called Manual Ordering Process. But as explained above, Uhlig himself admitted that the Manual Ordering Process was deliberately designed to be "commercially unviable."

54.   The Manual Ordering Process contains several cumbersome steps that cannot feasibly be completed within the statutory timeframes governing the delivery of disclosure documents, typically 10 to 15 business days, particularly not for the large volume of rush transactions that Rexera processes for its customers nationwide. Uhlig's own Complaint acknowledges that this process is "rarely used" and represents "a negligible portion" of the Community Information managed by Uhlig. Doc. 32 Am. Compl. ¶ 23. By its own terms

as stated on Uhlig's own website, CondoCerts does not allow for any rush processing. Yet it is common in the industry for customers to require rush processing to complete transactions. Indeed, a significant percentage of Rexera's customers' orders require rush processing. This includes many customers that require information for Uhlig-associated properties.

55.    Uhlig designed this unwieldy process to impede targets like Rexera from obtaining the requisite documentation soon enough to close real estate deals timely, thereby preventing Rexera from performing its contractual duties and disrupting Rexera's customer relationships. Coupled with the exclusivity requirements that Uhlig imposes on its customers, the net effect of the Manual Ordering Process is to completely bar RealPage and Rexera from doing business for title companies, lenders, buyers, and sellers with regard to real estate properties for which Uhlig keeps relevant documents.

**Manual Order Submission Process**

THIS MANUAL ORDERING PROCESS IS MADE AVAILABLE TO USERS WHO CHOOSE NOT TO USE, OR DECLINE TO ACCEPT THE USER AGREEMENTS REQUIRED FOR ACCESS TO, CONDOCERTS' OPTIONAL ONLINE ORDERING SYSTEMS. BEFORE CHOOSING THE MANUAL ORDERING PROCESS, PLEASE NOTE THAT IT IS LIMITED IN SCOPE TO PRODUCTS AND SERVICES THAT ARE REQUIRED BY LAW, AND DOES NOT OFFER OPTIONAL PRODUCTS, RUSH PROCESSING, ELECTRONIC PAYMENT OR OTHER SPECIAL HANDLING.

56.    What's more, the Manual Ordering Process cannot deliver disclosure documents on the terms that the governing statutes demand. Take California, for instance, which includes a categorical prohibition on imposing requirements for access beyond the

statute: "Delivery of the documents required by this section shall not be withheld for any reason nor subject to any condition except the payment of the fee authorized pursuant to subdivision (b)." Cal. Civ. Code § 4530(a)(3). Yet the Manual Ordering Process conditions delivery on much more than the fee. It requires, among other things, separately executed, original signature authorizations for each request, refuses electronic signatures, takes payment only by paper check or money order, and demands that a physical order package travel by mail or courier to an address in Overland Park, Kansas. https://manualorders.condocerts.com. Each requirement is a condition to delivery in violation of state law.

57.    Nor can the Manual Ordering Process reliably meet statutorily imposed deadlines. Consider Florida, which requires HOAs and condo associations to issue disclosure documents "[w]ithin 10 business days after receiving a written or electronic request." Fla. Stat. §§ 718.116(8); 720.30851. Texas also imposes a 10-business day limit. Tex. Prop. Code § 207.003(a). Against those clocks, the Manual Ordering Process rejects rush processing and routes every order through a serial, paper-bound sequence: submit an authorization and pre-submission form, await an eligibility determination, receive an order form, assemble and mail a physical package, await verification (and for any "errors or omissions," cure within 10 business days or start over), then await CondoCerts' order acceptance, processing, and delivery. A process built that way cannot consistently meet statutory deadlines. That incapacity is structural, evident from the process's own required steps, and does not turn on how any single order happens to come out.

58.     The Manual Ordering Process's ban on electronic transactions independently sinks the process. Florida, for instance, directs associations to honor an "electronic request." Fla. Stat. §§ 718.116(8); 720.30851. The Manual Ordering Process rejects that command. Instead, it declares that "electronic signatures on required documents will not be accepted" and "electronic payment" is not available, and forces the operative order onto paper checks and the U.S. mail. A statute that contemplates electronic dealing cannot be satisfied by a channel engineered to forbid it.

59.     Rexera's business proposition to its customers is simple: whoever holds the disclosure documents, Rexera finds them and timely delivers them. By imposing a Manual Ordering Process that Uhlig admitted is not viable and that, on its face, cannot meet the practical and legal requirements for timely delivery of disclosure documents, Uhlig subverted that proposition and caused Rexera to fall short of its promise to customers. The uncertainty and disruption injected by mail delays and arbitrary requirements for hard copies, original signatures, and money orders, among other things, undermine and interfere with Rexera's relationships with and ability to serve its customers.

60.     Uhlig's exclusionary campaign has already interfered with well over one thousand customer transactions that Rexera was engaged to process, which has caused significant reputational harm to Rexera and RealPage. This has, upon information and belief, caused delays, increased costs, and disruption to homeowners, title companies, and other transaction participants who bear no responsibility for Uhlig's dispute with Rexera.

61.    These delays and disruptions, in turn, have interfered with Rexera's contractual relationships with its customers, preventing Rexera from fulfilling its contractual duty to obtain closing documents on its customers' behalf.

## VII.    Uhlig's Scheme to Inflate the Acquisition Price for CondoCerts

62.    Before filing this lawsuit, Uhlig and RealPage engaged in discussions regarding RealPage's potential acquisition of Uhlig's business. Uhlig rejected RealPage's final offer and demanded a purchase price approximately $85 million higher.

63.    Uhlig's campaign to exclude Rexera and disseminate false accusations accusing RealPage, Rexera, and HWD of data theft, trade secret misappropriation, and other serious misconduct was designed to subject RealPage, Rexera, and HWD to ridicule, contempt, and degradation within their industry, and to coerce RealPage into paying an inflated acquisition price for CondoCerts.

64.    Uhlig's scheme was designed to obtain something of value—specifically, tens of millions of dollars in additional acquisition consideration—by harming RealPage and its affiliates' businesses through the dissemination of false and defamatory accusations to their customers and the industry at large.

65.    The campaign has achieved its intended effect. Over one thousand Rexera transactions have been disrupted, at least 30 HWD customers have terminated their contracts and moved their business to CondoCerts, and multiple PMCs have banned Rexera from contacting them. The stated rationale traces back to the same Uhlig-perpetrated falsehoods: that Rexera, RealPage, and HWD are stealing data from PMCs and HOAs.

## VIII.   Uhlig's Conduct Under Color of Statutory Obligation

66.    As explained above, many States impose mandatory obligations on HOAs and their authorized agents—including entities like Uhlig that contract with PMCs to process disclosure document requests—to produce closing documents to authorized requestors within specified timeframes. These statutes create a public right of access to HOA and condo association information in connection with real estate transactions. For example:

- **Arizona.** Arizona provides multiple independent access pathways. A.R.S. § 33-1806(A) (planned communities) and § 33-1260 (condos) require the association to furnish a statement containing unpaid assessments to "a purchaser or a purchaser's authorized agent" upon request. A.R.S. §§ 33-1807(J) and 33-1256(J) separately require the association to furnish a lien estoppel statement to "a lienholder, escrow agent, member or person designated by a member." The lien estoppel statement "is binding on the association if the statement is requested by an escrow agency that is licensed pursuant to title 6, chapter 7." *Id.* Arizona thus provides express statutory access to purchasers' authorized agents, escrow agents, and persons designated by members—three independent pathways, each of which encompasses Rexera or its title company clients.

- **California.** Cal. Civ. Code § 4530(a)(1) requires delivery of specified transfer disclosure documents to "the owner of a separate interest, or any other recipient authorized by the owner." The "any other recipient authorized by the owner" formulation encompasses any party the owner has authorized to receive closing documents—including a title company engaged to handle the closing and, by extension, the title company's agents performing closing-service functions. Under Cal. Civ. Code § 2319, an agent has authority "to do everything necessary or proper and usual, in the ordinary course of business, for effecting the purpose of his agency." Section 4530(a)(3) further provides that "[d]elivery of the documents required by this section shall not be withheld for any reason nor subject to any condition except the payment of the fee." Section 4530(c) authorizes associations to contract with "any person or entity" for compliance facilitation—permissive language that forecloses any claim of statutory exclusivity.

- **District of Columbia.** D.C. Code §§ 42-1903.13(h) and 42-1904.11(b) require the association to furnish an assessment statement or resale certificate to "[a]ny unit owner or purchaser." Under D.C. Code § 42-2018, "a purchaser, or a lender under a deed of trust, mortgage, or encumbrance, or parties designated

by them" may request disclosure information. D.C.'s statutes expressly authorize requests from purchasers and, for older condominiums, from lenders and their designated parties.

- **Florida.** Florida Statutes §§ 720.30851 (HOA) and 718.116(8) (Condo) require the association to issue a disclosure document within ten business days of receiving a request from a parcel or unit owner, the owner's designee, a mortgagee, or the mortgagee's designee. Neither statute defines "designee" or limits who may serve in that capacity.

- **Georgia.** O.C.G.A. §§ 44-3-232(d) (HOA) and 44-3-109(d) (Condo) require the association to furnish a statement of unpaid assessments within five business days to a lot or unit owner, a mortgagee, a person having executed a contract for the purchase of the lot or unit, or a lender considering a loan secured by the lot or unit. Georgia's statute expressly authorizes requests from purchasers under contract and prospective lenders, categories that do not require any designation by the property owner. Failure to furnish the statement within five business days results in extinguishment of the association's lien as to the title acquired.

- **North Carolina.** N.C. Gen. Stat. §§ 47F-3-118(b) (Planned Community Act) and 47C-3-118(b) (Condominium Act) require the association to furnish a statement of unpaid assessments within ten business days to "the [lot/unit] owner or the [lot/unit] owner's authorized agents." A title company engaged by the owner to handle the closing is the owner's authorized agent for purposes of procuring the documents necessary to close the transaction, including the assessment statement. The title company's subagent performing that closing function—here, Rexera—acts within the chain of authority as one of the owner's "authorized agents."

- **Texas.** Texas provides two statutory frameworks governing disclosure documents and resale certificates for different community types. For HOA communities, Texas Property Code § 207.003(a) requires the association to furnish a resale certificate within 10 business days to any of six expressly enumerated categories: (1) the property owner, (2) the owner's agent, (3) the purchaser, (4) the purchaser's agent, (5) a title insurance company, or (6) an agent of a title insurance company acting on behalf of the owner or purchaser. For condominium communities, Texas Property Code § 82.157(b) requires the association to furnish a resale certificate within ten days to "the selling unit owner or the owner's agent." The term "the owner's agent" is undefined. A title company engaged by the owner to handle the closing is the owner's agent for purposes of procuring the documents necessary to close the transaction, and Rexera, as the title company's subagent performing that closing function, acts within the scope of "the owner's agent."

**Defendant/Counter-Plaintiffs' Amended**
**Counterclaims and Answer to Amended Complaint**                    Page 19 of 69

67. Each of these exemplary statutes reflects the same legislative judgment: The information contained in disclosure documents and assessment statements is essential to facilitating real estate transactions, and therefore, that information must be accessible so that the real estate market can operate efficiently and on schedule. The statutes impose short deadlines of just a few days, prescribe penalties for noncompliance (including lien extinguishment and civil penalties), and in several cases make the statement binding on the HOA or condo association.

68. Rexera acts within each of these statutory frameworks as an agent of the title company, lender, homeowner, or buyer, depending on the type of underlying transaction and the state where the property is located.

69. By contracting with PMCs to serve as the exclusive processor of disclosure document requests, Uhlig has assumed the statutory obligations of the associations it represents. But Uhlig does not honor those obligations in compliance with state law. Instead, Uhlig conditions the delivery of statutorily required documents on compliance with its own Terms of Use and refuses to deliver documents to authorized requestors who do not accept its onerous terms—which, on information and belief, Uhlig enforces selectively to suit its ends.

70. When Uhlig refuses to process a request from an authorized requestor, it obstructs the statutory mechanism through which homeowners, buyers, lenders, and title companies obtain critical home-sale information the law requires to be produced.

71. Uhlig has thus abused its gatekeeper position to cut off Rexera's access to information that the law requires be made available, forbid its customers from processing

alternative requests for this information, unfairly compete against HWD, and coerce RealPage into paying an inflated price for CondoCerts.

**COUNT I: DECLARATORY JUDGMENT**

72.     Defendants reallege and incorporate by reference all preceding counterclaim allegations as though fully set forth herein.

73.     An actual, justiciable controversy exists between the parties regarding: (a) whether Rexera has the right to access disclosure documents and assessment statements as an authorized requestor under the statutes of Arizona, California, the District of Columbia, Florida, Georgia, North Carolina, and Texas; (b) whether Uhlig's exclusive-dealing arrangements and User Agreement restrictions unlawfully foreclose access by authorized requestors to statutorily mandated disclosures; and (c) whether Uhlig, as the authorized and exclusive agent of HOAs and PMCs, assumed the statutory obligations those associations bear, including the obligation to deliver disclosure documents to authorized requestors within the timeframes mandated by statute.

74.     Under the Declaratory Judgment Act, 28 U.S.C. § 2201, Defendants are entitled to a declaration that:

- Rexera, when acting on behalf of a parcel owner, mortgagee, purchaser, lender, title company, or their agents in connection with a specific real estate transaction, qualifies as an authorized requestor under:

  (i)     Florida Statutes §§ 720.30851 and 718.116(8), as a designee of the parcel or unit owner or mortgagee;

  (ii)    Texas Property Code § 207.003(a), as an agent of a title insurance company acting on behalf of the owner or purchaser, or as a purchaser's agent, and Texas Property Code § 82.157(b), as the owner's agent or as a subagent of the title company acting as the owner's closing agent;

(iii)   O.C.G.A. §§ 44-3-232(d) and 44-3-109(d), as an agent of a person having executed a contract for the purchase of the property or of a lender considering a loan secured by the property;

(iv)   A.R.S. §§ 33-1806(A), 33-1807(J), 33-1260, and 33-1256(J), as a purchaser's authorized agent, the agent of a licensed escrow agent, or a person designated by a member;

(v)   D.C. Code §§ 42-1903.13(h), 42-1904.11(b), and 42-2018, as an agent of a purchaser or of a lender or parties designated by them;

(vi)   Cal. Civ. Code § 4530(a)(1), as a recipient authorized by the owner or as a subagent of the title company acting as the owner's authorized closing agent; and

(vii)   N.C. Gen. Stat. §§ 47F-3-118(b) and 47C-3-118(b), as one of the lot or unit owner's authorized agents, acting through the title company engaged by the owner to handle the closing;

- Uhlig's User Agreements, to the extent they purport to prohibit authorized designees from accessing statutorily mandated information, are illegal and unenforceable as contrary to public policy and state laws requiring access to the information;

- Uhlig's Section 2.2(f) exclusivity clause, which requires its customers to process "substantially all" disclosure document transactions through the CondoCerts platform, cannot override the statutory rights of authorized requestors or the corresponding duties of HOAs, PMCs, and their agents under the statutes enumerated above; and

- Uhlig, as the authorized and exclusive agent of HOAs and PMCs, is subject to the same statutory obligations as the associations it represents, including the obligation to produce disclosure documents to authorized designees within the timeframes mandated by statute.

75.   This controversy does not turn on any right to online or automated access. Defendants do not contend that any statute requires Uhlig to deliver disclosure documents through an online platform. The question is channel-neutral: whether Uhlig, having made itself the exclusive avenue through which its PMC and HOA customers may deliver disclosure documents, may invoke its supposed contractual rights to foreclose timely delivery to authorized requestors that state law requires associations to provide. By

**Defendant/Counter-Plaintiffs' Amended**
**Counterclaims and Answer to Amended Complaint**                    Page 22 of 69

crowning itself the exclusive path, Uhlig assumed the associations' statutory delivery obligations. It cannot contract its way out of them.

76. This controversy is ripe for adjudication. Uhlig terminated Rexera's access to the CondoCerts platform effective March 13, 2026, leaving Rexera and its customers to obtain statutorily mandated documents on Uhlig's terms or not at all.

77. Uhlig's only sanctioned alternative, the Manual Ordering Process, cannot deliver disclosure documents within the timeframes state law requires. Uhlig's own principal, Mark Uhlig, told RealPage's Sean Leaver that the process was designed to be "commercially unviable," and the process forecloses rush processing on its face.

78. The defect does not turn on the outcome of any single order. Even if the process could deliver documents for an isolated transaction, it admittedly cannot serve the volume of time-sensitive orders Rexera processes on its customers' deadlines, and that uncertainty alone prevents Rexera from reliably fulfilling orders for properties Uhlig controls. No further contingency need occur for the Court to resolve the parties' adverse positions.

**COUNT II: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS**

79. Defendants reallege and incorporate by reference all preceding counterclaim allegations as though fully set forth herein.

80. Rexera, RealPage, and HWD had existing and prospective business relationships with PMCs, HOA boards, title companies, and/or lenders across the United States. These relationships were known to Uhlig. Uhlig occupies the intermediary position between sell-side PMCs and buy-side agents like Rexera, and has direct knowledge of which

companies order disclosure documents through its platform. Uhlig competes against HWD in the business of keeping and providing disclosure documents for HOAs and PMCs.

81.    Uhlig intentionally interfered with these business relationships through a coordinated campaign that included: (a) seeding a false narrative through sales communications and industry events characterizing Rexera, RealPage, and HWD's lawful activity as unauthorized, unlawful, or illicit; (b) providing PMCs with scripted language to reject Rexera's document requests and disparage Rexera, RealPage, and HWD; and (c) leveraging its exclusive contracts to coerce PMCs into refusing to deal with Rexera, RealPage, and HWD.

82.    Uhlig's interference caused actual harm to Rexera's, RealPage's, and HWD's business relationships. For example, Young Management terminated its relationship with HWD effective March 20, 2026, citing concerns directly traceable to Uhlig's narrative and allegations; and Trident Management refused to process Rexera's document requests using language that tracked Uhlig's litigation talking points.

83.    Industry contacts reported that CondoCerts representatives falsely characterized Rexera's access as unauthorized, in an effort to poison Rexera, HWD, and RealPage's reputation. Multiple PMCs terminated their contracts with HWD and moved their business to CondoCerts, with some departing PMCs citing the false accusations of data misappropriation that Uhlig had disseminated. In some cases, the departing customers were simply repeating false and misleading information that they had learned from CondoCerts or its agents.

84.     To date, Uhlig's conduct has interfered with well over one thousand customer transactions that Rexera was engaged to process, causing delays, increased costs, and disruption to homeowners, title companies, and other transaction participants. And at least 30 customers covering over 363,000 units have terminated their relationships with HWD.

85.     Uhlig's conduct was improper. Uhlig orchestrated a campaign of disinformation through third parties, in which the narrative was seeded through sales relationships and laundered through word-of-mouth rumors so the source was obscured. Uhlig's interference was motivated not by the protection of any legitimate contractual interests but by a desire to poach HWD's customers for the benefit of CondoCerts and inflate the purchase price that RealPage would pay to acquire CondoCerts.

86.     As a direct and proximate result of Uhlig's tortious interference, Rexera, HWD, and RealPage have suffered damages including lost business relationships, lost revenue, lost customers (including those that moved their business to CondoCerts itself), reputational harm, disruption of over one thousand customer transactions, and increased costs of operations, in amounts to be proven at trial.

## COUNT III: UNFAIR AND DECEPTIVE TRADE PRACTICES
### (N.C. GEN. STAT. § 75-1.1)

87.     Defendants reallege and incorporate by reference all preceding counterclaim allegations as though fully set forth herein.

88.     North Carolina law governs this claim. Uhlig's anticompetitive conduct caused injury to Rexera, RealPage, and HWD's business in North Carolina, where Rexera processed approximately 998 transactions through the CondoCerts platform. The CondoCerts Terms of Use choice-of-law clause does not extend to these claims, which arise

from independent statutory duties and extracontractual conduct—not from the CondoCerts terms of service relationship.

89.    Uhlig engaged in unfair methods of competition and unfair acts or practices in or affecting commerce in violation of N.C. Gen. Stat. § 75-1.1. Uhlig's conduct is immoral, unethical, oppressive, and substantially injurious. Specifically, Uhlig (a) imposed contracts requiring PMCs to route "substantially all" disclosure document transactions through CondoCerts and prohibiting the PMCs and the HOAs they represent from delivering those documents to authorized requestors through any other channel; (b) orchestrated a coordinated disinformation campaign through cooperating PMCs, disseminating false accusations of data theft and trade secret misappropriation to Rexera's and RealPage's customers; and (c) maintained a commercially unviable Manual Ordering Process designed to function as a dead end rather than a true alternative.

90.    Uhlig also engaged in deceptive acts or practices having the capacity or tendency to deceive. Beginning on or about March 19, 2026, Uhlig or its agents transmitted electronic communications to PMCs and industry participants containing false statements that Rexera was "not an authorized party" to transactions and was "taking CondoCerts data and claiming it as their own." Uhlig or its agents also falsely accused Rexera of scraping or harvesting data for the benefit of HWD. These statements were false because Rexera was an authorized requestor under applicable state statutes, paid Uhlig's full asking price for every document ordered, did not misrepresent Uhlig's data as its own, and did not scrape or harvest data.

91.   Uhlig made these false statements for the purpose of harming Rexera, RealPage, and HWD's business, diverting HWD's customers to CondoCerts, and coercing RealPage into paying an inflated acquisition price.

92.   Counter-Plaintiffs' claims under this Count are based on Uhlig's independent conduct: contracts that prevent PMCs and HOAs from honoring statutory delivery obligations, a disinformation campaign directed at third parties, and serial litigation to deter use of any non-CondoCerts channel. Each gives rise to duties imposed by law.

93.   Uhlig's conduct occurred in or affecting commerce as defined by N.C. Gen. Stat. § 75-1.1(b). Rexera processed approximately 998 transactions through the CondoCerts platform involving North Carolina properties. As a direct and proximate result of Uhlig's unfair and deceptive conduct, Rexera, RealPage, and HWD have suffered actual injury, including lost revenue from North Carolina transactions, lost customer relationships, and reputational harm, in amounts to be proven at trial.

94.   Pursuant to N.C. Gen. Stat. § 75-16, Defendants are entitled to mandatory treble damages. Defendants further seek attorneys' fees under N.C. Gen. Stat. § 75-16.1.

**COUNT IV: UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200)**

95.   Defendants reallege and incorporate by reference all preceding counterclaim allegations as though fully set forth herein.

96.   California law governs this claim because Uhlig's conduct caused injury to Rexera, RealPage, and HWD's business in California, where Rexera processed approximately 806 transactions through the CondoCerts platform. For the reasons stated

in Count III, the CondoCerts Terms of Use choice-of-law clause does not extend to these claims.

97.    Uhlig's conduct constitutes "unlawful" business practices under the UCL. The UCL borrows violations of other laws as predicates for independent liability. California Civil Code § 4530(a)(3) prohibits conditioning the delivery of association records on anything other than payment of a fee. Uhlig's exclusive-dealing contracts and platform restrictions condition delivery of disclosure documents on compliance with Uhlig's contractual demands, in violation of Section 4530(a)(3). This statutory violation constitutes an independently actionable unlawful business practice.

98.    Uhlig's conduct also constitutes "unfair" business practices. Uhlig's contracts and litigation impose substantial harm on consumers and competition. The contracts require PMCs to route "substantially all" transactions through CondoCerts and prohibit the PMCs and the HOAs they represent from delivering those documents through any other channel—even to authorized requestors holding statutory rights of access. Uhlig deters use of any other channel through serial litigation. The combined effect creates barriers to entry and forecloses delivery of disclosure documents by any provider for properties managed by Uhlig-contracted PMCs.

99.    Uhlig's conduct further constitutes "fraudulent" business practices. Beginning at least on or about March 19, 2026, Uhlig or its agents transmitted communications to PMCs, HOA boards, and industry participants containing false statements that Rexera was "not an authorized party" to transactions and was "taking CondoCerts data and claiming it as their own." These statements were transmitted through

electronic communications to PMCs (including the scripted refusal from Trident Management on March 19, 2026), through termination notices from PMCs to RealPage (including Young Management's March 20, 2026 termination of its HWD contract), and through in-person communications at industry meetings and conferences. These statements were likely to deceive members of the relevant public into believing that Rexera's lawful business activities were unauthorized and illicit.

100.    Uhlig engaged in this conduct for the purpose of harming Rexera, RealPage, and HWD's business, diverting HWD's customers to CondoCerts, and coercing RealPage into paying an inflated acquisition price.

101.    Counter-Plaintiffs lack an adequate remedy at law. Uhlig's conduct is ongoing and continues to harm Counter-Plaintiffs in the marketplace. Although Counter-Plaintiffs seek damages for the quantifiable portion of their injury, the ongoing loss of reputation, market position, and goodwill caused by Uhlig's continuing conduct cannot be fully measured or remedied by money damages. Injunctive relief is necessary to prevent further harm.

102.    Rexera processed approximately 806 transactions through the CondoCerts platform involving California properties. As a direct result of Uhlig's unfair competition, Defendants seek injunctive relief prohibiting Uhlig from continuing its unlawful, unfair, and fraudulent business practices, and restitution of amounts wrongfully obtained. Cal. Bus. & Prof. Code § 17203.

**Defendant/Counter-Plaintiffs' Amended**
**Counterclaims and Answer to Amended Complaint**                    Page 29 of 69

**COUNT V: DECEPTIVE AND UNFAIR TRADE PRACTICES (FLA. STAT. § 501.204)**

103.    Defendants reallege and incorporate by reference all preceding counterclaim allegations as though fully set forth herein.

104.    Florida law governs this claim. Uhlig conceded in prior litigation in this District that Florida law governs FDUTPA claims arising from the same CondoCerts platform and the same Terms of Use at issue here. *See Uhlig LLC v. PropLogix, LLC*, No. 2:22-cv-2475-KHV-ADM, Doc. 320 Pls's Mem. Supp. Mot. Partial Summ. J. at 36 n.15 (D. Kan. Apr. 5, 2024) ("The parties agree this claim is governed by the laws of the State of Florida."). That concession is directly on point and binding on Uhlig's position here.

105.    Uhlig engaged in unfair practices in the conduct of trade or commerce in violation of Fla. Stat. § 501.204. Uhlig's conduct causes or is likely to cause substantial injury, including delayed real estate closings with concrete monetary costs including rate-lock expirations and per diem charges, and denial of timely disclosure documents to homeowners who authorize designees. The injury is not reasonably avoidable by consumers. Homeowners do not select the disclosure document provider. PMCs are bound by Uhlig's contracts to route documents through CondoCerts and to refuse delivery through any other channel. And homeowners learn about fees and channels only at or near closing, when the transaction is committed. The injury is not outweighed by countervailing benefits. Uhlig's contracts override the associations' statutory delivery obligations and provide no consumer benefit in the form of improved service, lower prices, or enhanced quality.

106.    Uhlig also engaged in deceptive acts in the conduct of trade or commerce. Beginning on or about March 19, 2026, Uhlig or its agents transmitted electronic communications to PMCs and industry participants containing representations that Rexera

was "not an authorized party" to transactions and was "taking CondoCerts data and claiming it as their own." These representations were objectively misleading because Rexera was an authorized requestor under applicable state statutes, paid Uhlig's full asking price for every document ordered, and did not misrepresent Uhlig's data as its own. Uhlig made these representations for the purpose of harming Rexera, RealPage, and HWD, diverting HWD's customers to CondoCerts, and coercing RealPage into paying an inflated acquisition price.

107. In addition to the harm to Counter-Plaintiffs, Uhlig's unfair and deceptive practices have caused injury and detriment to consumers. Homeowners in Florida who authorize designees to obtain disclosure documents have experienced, on information and belief, delayed closings, restricted access to statutorily mandated information, and reduced choice among service providers. These consumer harms are structural. They arise from Uhlig's contractual architecture, which prohibits PMCs and HOAs from delivering disclosure documents through any channel except CondoCerts and on Uhlig's terms.

108. Uhlig engaged in this conduct for the purpose of harming Rexera, RealPage, and HWD's business, diverting HWD's customers to CondoCerts, and coercing RealPage into paying an inflated acquisition price.

109. Counter-Plaintiffs lack an adequate remedy at law. Uhlig's conduct is ongoing and continues to harm Counter-Plaintiffs in the marketplace. Although Counter-Plaintiffs seek damages for the quantifiable portion of their injury, the ongoing loss of reputation, market position, and goodwill caused by Uhlig's continuing conduct cannot be fully

measured or remedied by money damages. Injunctive relief is necessary to prevent further harm.

110. Rexera processed approximately 4,106 transactions through the CondoCerts platform involving Florida properties—the highest volume of any state. As a direct and proximate result of Uhlig's deceptive and unfair practices, Defendants have suffered actual damages including lost revenue, lost customer relationships, and reputational harm, in amounts to be proven at trial. Defendants seek actual damages under Fla. Stat. § 501.211(2), injunctive relief under Fla. Stat. § 501.211(1), and attorneys' fees and costs under Fla. Stat. § 501.2105.

## COUNT VI: LANHAM ACT (15 U.S.C. § 1125(a))

111. Defendants reallege and incorporate by reference all preceding counterclaim allegations as though fully set forth herein.

112. Uhlig made false and misleading representations about the nature, characteristics, and qualities of Rexera, RealPage, and HWD's services and commercial activities, including that Rexera was "not an authorized party" to transactions, that Rexera was "taking CondoCerts data and claiming it as their own," that Rexera scraped or harvested data for the benefit of HWD, and that "HWD/RealPage is under big fire for this" alleged misconduct.

113. These statements were false because Rexera was an authorized requestor under applicable state statutes, paid Uhlig's full asking price for every document ordered, did not misrepresent Uhlig's data as its own, and did not scrape or harvest data for the benefit of HWD or anyone else.

114.    Uhlig made these misrepresentations for the purpose of harming Rexera, RealPage, and HWD's business, diverting HWD's customers to CondoCerts, and coercing RealPage into paying an inflated acquisition price.

115.    Uhlig disseminated these statements widely among the relevant purchasing public, that is, PMCs, HOAs, and others in the real estate industry. As a result of Uhlig's broad dissemination of these statements among the relevant purchasing public, several customers of Rexera, RealPage, and/or HWD terminated their relationships, with several citing specific talking points and language that Uhlig disseminated.

116.    Uhlig's false statements were not isolated customer-service remarks. Uhlig disseminated them to influence purchasing decisions across the industry: through sales communications to PMCs, through written marketing material, including flyers, distributed broadly to industry participants, and through statements at industry meetings and conferences. This was commercial advertising and promotion directed at the relevant purchasing public to divert customers from Rexera, RealPage, and HWD to CondoCerts.

117.    Uhlig's false and misleading statements proximately caused an injury to Counter-Plaintiffs' commercial interests in sales and business reputations. Specifically, Uhlig's false and misleading statements caused Rexera, RealPage, and HWD to lose customers (some of whom even went directly to CondoCerts) and spread reputationally damaging false rumors that RealPage, Rexera, and HWD had engaged in data theft, trade secret misappropriation, and other misconduct.

118.    Counter-Plaintiffs lack an adequate remedy at law. Uhlig's conduct is ongoing and continues to harm Counter-Plaintiffs in the marketplace. Although Counter-Plaintiffs

seek damages for the quantifiable portion of their injury, the ongoing loss of reputation, market position, and goodwill caused by Uhlig's continuing conduct cannot be fully measured or remedied by money damages. Injunctive relief is necessary to prevent further harm.

## RESERVATION TO ASSERT ADDITIONAL COUNTERCLAIMS

119.   Counter-Plaintiffs reserve the right to assert additional counterclaims, including, but not limited to, claims under federal and state antitrust statutes, state unfair-competition statutes, or other applicable law, as may become appropriate based on facts developed through discovery.

## JURY DEMAND

120.   Defendants demand a trial by jury on all issues and claims triable to a jury.

## PRAYER FOR RELIEF

Defendants and Counterclaim Plaintiffs RealPage, Inc., TOMTE, LLC d/b/a Rexera, and Nextlevel Association Solutions, Inc. d/b/a HomeWiseDocs respectfully pray for judgment as follows:

- Dismissing Uhlig's Complaint with prejudice and denying Uhlig all relief sought therein;

- On the First Count in Defendants' Counterclaim, entering a declaratory judgment that: (a) Rexera has the right to access disclosure documents as an authorized requestor under applicable state statutes; (b) Uhlig's User Agreements are unenforceable to the extent they foreclose access by authorized requestors to statutorily mandated disclosures; and (c) Uhlig is subject to statutory obligations to produce disclosure documents to authorized designees;

- On the Second, Third, and Fifth Counts in Defendants' Counterclaim, entering judgment in favor of Defendants and against Uhlig for compensatory damages in an amount to be proven at trial, including lost revenue, lost business

relationships, lost customers, reputational harm, and disruption of over one thousand customer transactions;

- On the Third Count in Defendants' Counterclaim, entering judgment in favor of Defendants and against Uhlig for treble the amount of damages sustained pursuant to N.C. Gen. Stat. § 75-16, together with attorneys' fees under N.C. Gen. Stat. § 75-16.1;

- On the Fourth Count in Defendants' Counterclaim, entering injunctive relief prohibiting Uhlig's unlawful, unfair, and fraudulent business practices, and restitution of amounts wrongfully obtained, pursuant to Cal. Bus. & Prof. Code § 17203;

- On the Fifth Count in Defendants' Counterclaim, entering judgment in favor of Defendants and against Uhlig for actual damages, injunctive relief, and attorneys' fees and costs pursuant to Fla. Stat. §§ 501.211, 501.2105;

- On the Sixth Count in Defendants' Counterclaim, entering judgment in favor of Defendants and against Uhlig for damages, Uhlig's profits, injunctive relief, and attorneys' fees and costs pursuant to 15 U.S.C. §§ 1116, 1117, and 1125;

- Awarding Defendants their costs and reasonable attorney's fees as permitted by applicable law;

- Awarding pre-judgment and post-judgment interest; and

- Granting such other and further relief to which Defendants/Counter-Plaintiffs may be entitled.

## DEFENDANTS' ANSWER TO AMENDED COMPLAINT[1]

### PARTIES

1.    Defendants admit the allegations in Paragraph 1.

2.    Defendants admit the allegations in Paragraph 2.

3.    Defendants admit the allegations in Paragraph 3.

4.    Defendants admit the allegations in Paragraph 4.

### JURISDICTION AND VENUE

5.    Defendants admit that the Court may exercise personal jurisdiction over them for purposes of this case, but Defendants deny the remaining allegations in Paragraph 5.

6.    Defendants admit that the Court may exercise personal jurisdiction over them for purposes of this case, but Defendants deny the remaining allegations in Paragraph 6.

7.    In response to Paragraph 7, Defendants admit that this Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and supplemental jurisdiction under 28 U.S.C. § 1367, but Defendants deny the remaining allegations in Paragraph 7.

8.    Defendants submit to venue in this Court for purposes of this case, but Defendants deny the remaining allegations in Paragraph 8.

### GENERAL ALLEGATIONS

9.    Defendants admit that HWD competes with Uhlig in the national market for transfer and disclosure documents related to residential real estate transactions. Defendants deny the remaining allegations in Paragraph 9.

10.    Defendants deny the allegations in Paragraph 10.

---

[1] The paragraph numbers below correspond to those in Plaintiff's amended complaint.

11.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 11, and therefore such allegations are denied.

12.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 12, and therefore such allegations are denied.

13.    In response to Paragraph 13, Defendants admit that Uhlig's clients authorize Uhlig to timely provide certain information, including disclosure documents, in connection with the purchase, sale, financing, refinancing and transfer of residential real estate in common interest communities. Defendants deny the remaining allegations in Paragraph 13.

14.    Defendants admit that Uhlig's contracts with its clients generally purport to require that Uhlig be the only party with authorization to provide certain documents and information in connection with certain real estate transactions. Defendants deny the remaining allegations in Paragraph 14.

15.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 15 concerning the specific means by which Uhlig makes information available, and therefore such allegations are denied. Defendants, however, do not dispute that Uhlig operates digital ordering sites.

16.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 16, and therefore such allegations are denied.

17.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 17, and therefore such allegations are denied.

18.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 18, and therefore such allegations are denied.

19.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 19, and therefore such allegations are denied.

20.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20, and therefore such allegations are denied.

21.     Defendants deny the allegations in Paragraph 21.

22.     Defendants admit Uhlig has not allowed some users, in particular Rexera, to access or use the Uhlig Systems and instead purported to require them to place orders using the so-called Manual Ordering Process. Defendants deny the remaining allegations in Paragraph 22, including any suggestion that the Manual Ordering Process is a commercially viable alternative to access via the Uhlig Systems.

23.     Defendants admit that the Manual Ordering Process is rarely (if ever) used and represents a negligible portion of Community Information managed or delivered by Uhlig. Defendants deny the remaining allegations in Paragraph 23, including that the Manual Ordering Process can feasibly be completed within the statutory timeframes governing the delivery of disclosure documents in connection with many real estate transactions. Defendants aver that this process is designed to be impracticable and to function as a dead end rather than a genuine alternative to electronic access.

24.     In response to the allegations in Paragraph 24, Defendants admit that certain Rexera marketing material discusses potential manual coordination for HOA documents. Defendants deny any suggestion that "manual coordination" equates to Uhlig's Manual Ordering Process and deny the remaining allegations in Paragraph 24.

25.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 25, and therefore such allegations are denied.

26.    Defendants deny the allegations in Paragraph 26. Defendants aver that Uhlig's principal represented that the Manual Ordering Process was designed to be "commercially unviable." To the extent this paragraph otherwise refers to the intended effect of the User Agreements, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations, and therefore such allegations are denied.

27.    Defendants admit that Uhlig provides, or is obligated to provide, Community and Owner Information that is specific to the properties that are subject to a request for information. Defendants also admit the allegation in the second sentence of Paragraph 27 that information provided by Uhlig may be perishable and time sensitive, but Defendants lack knowledge or information sufficient to form a belief as to the remaining allegations in Paragraph 27 and such allegations are denied.

28.    Defendants admit that transaction participants generally may rely on the accuracy of underwriting information in making financial decisions and risk assessments. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 28, and therefore such allegations are denied.

29.    Defendants admit that some disclosure documents are perishable and time-sensitive. Defendants deny the remaining allegations in Paragraph 29.

30.    Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30, and therefore the allegations are denied.

31. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31, and therefore the allegations are denied.

32. Defendants admit that the User Agreements purport to prohibit certain actions set forth in the User Agreements, but denies the specific characterizations of the User Agreements alleged in Paragraph 32. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 32, and therefore such allegations are denied.

33. Defendants deny the allegations in Paragraph 33.

34. Paragraph 34 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 34, and therefore the allegations are denied.

35. Defendants deny the allegations in Paragraph 35.

36. Defendants admit that Uhlig charges fees for providing property information related to identified transactions, that in certain instances those fees are statutorily regulated, and that Uhlig typically retains a processing fee. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 36, and therefore the allegations are denied.

37. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37, and therefore the allegations are denied. To the extent that Paragraph 37 purports to characterize the terms or effect of the User Agreements, Defendants deny those characterizations.

38. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38, and therefore the allegations are denied. To the extent that Paragraph 38 purports to characterize the terms or effect of the User Agreements, Defendants deny those characterizations.

39. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39, and therefore the allegations are denied.

40. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40, and therefore the allegations are denied.

41. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41, and therefore the allegations are denied.

42. Paragraph 42 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Terms of Use as alleged in Paragraph 42.

43. Paragraph 43 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Terms of Use as alleged in Paragraph 43.

44. Paragraph 44 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Terms of Use as alleged in Paragraph 44.

45. Paragraph 45 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Terms of Use as alleged in Paragraph 45.

46.    Paragraph 46 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Terms of Use as alleged in Paragraph 46.

47.    Paragraph 47 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Terms of Use as alleged in Paragraph 47.

48.    Paragraph 48 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Terms of Use as alleged in Paragraph 48.

49.    Paragraph 49 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Terms of Use as alleged in Paragraph 49.

50.    Paragraph 50 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Terms of Use as alleged in Paragraph 50.

51.    Paragraph 51 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Account Registration Agreement as alleged in Paragraph 51.

52.    Paragraph 52 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Account Registration Agreement as alleged in Paragraph 52.

53.    Defendants admit that the user is required to provide information when registering as a user of Uhlig's Online Ordering Sites. Paragraph 53 also contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Account Registration Agreement as alleged in Paragraph 53.

54.    Paragraph 54 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Account Registration Agreement as alleged in Paragraph 54.

55.    Paragraph 55 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Order Submission Agreement as alleged in Paragraph 55.

56.    Paragraph 56 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the characterizations of HWD's End User Agreement in Paragraph 56. Defendants further deny that Paragraph 56 accurately quotes the End User Agreement. Defendants deny any remaining allegations in Paragraph 56.

57.    Paragraph 57 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the characterizations of HWD's End User Agreement in Paragraph 57.

58.    Paragraph 58 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the characterizations of HWD's End User Agreement in Paragraph 58.

59.    Paragraph 59 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the characterizations of HWD's End User Agreement in Paragraph 59.

60.    Paragraph 60 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the characterizations of HWD's End User Agreement in Paragraph 60.

61.    Paragraph 61 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the characterizations of HWD's End User Agreement in Paragraph 61.

62.    Defendants admit that when users create a new account with HWD, they are required to select a user type as detailed in the URL quoted in Paragraph 62. Defendants deny that this is "consistent with Uhlig's Ordering Sites." Defendants deny any remaining allegations in Paragraph 62.

63.    Paragraph 63 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the characterizations of the Rexera Terms of Use in Paragraph 63.

64.    Paragraph 64 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the characterizations of the Rexera Terms of Use in Paragraph 64.

65.    Paragraph 65 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the characterizations of the Rexera Terms of Use in Paragraph 65.

66.    Paragraph 66 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the characterizations of the Rexera Terms of Use in Paragraph 66.

67.    Paragraph 67 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the characterizations of the Rexera Terms of Use in Paragraph 67.

68.    Paragraph 68 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the characterizations of the Rexera Terms of Use in Paragraph 68.

69.    Defendants admit that the Rexera website explains how its services are provided, but Defendants deny any remaining allegations in Paragraph 69.

70.    Defendants admit that Paragraph 70 includes an excerpt from Rexera's website, but Defendants deny any remaining allegations in Paragraph 70.

71.    Defendants admit that Paragraph 71 includes an excerpt from Rexera's website, but Defendants deny any remaining allegations in Paragraph 71.

72.    Defendants deny the allegations in Paragraph 72.

73.    Defendants admit that Rexera charges a fee for its services. Defendants deny the remaining allegations in Paragraph 73.

74.    Defendants deny the allegations in Paragraph 74.

75.    Defendants admit that a RealPage subsidiary owns and operates a platform called HWD, but Defendants deny any remaining allegations in Paragraph 75.

76.    Defendants admit that HWD provides services related to Common Interest Community documentation, but deny the remaining allegations in Paragraph 76.

77.    Defendants admit that RealPage acquired Rexera, and that on or about July 29, 2025, RealPage closed on the transaction through which it acquired Rexera, but Defendants deny any remaining allegations in Paragraph 77.

78.    Defendants admit that Rexera describes certain of its services as involving automated technology for HOA document collection and related services, but Defendants deny any remaining allegations in Paragraph 78.

79.    Defendants deny the allegations in Paragraph 79.

80.    Defendants deny the allegations in Paragraph 80.

81.    Defendants admit that HWD sent marketing emails touting its Global Search function, but Defendants deny any remaining allegations in Paragraph 81.

82.    Defendants admit that the HWD website states: "HOA and Condo docs for *every* association." Defendants deny any remaining allegations in Paragraph 82.

83.    Defendants admit that HWD has published a video explaining its Global Search function and that the function relies on Rexera for HOAs not on the HWD platform, but Defendant deny the remaining allegations in Paragraph 83.

84.    Defendants deny the allegations in Paragraph 84.

85.    Paragraph 85 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the characterizations of Uhlig's Terms of Use in Paragraph 85.

86.     Paragraph 86 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the characterizations of Uhlig's Terms of Use in Paragraph 86.

87.     Paragraph 87 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the characterizations of Uhlig's Terms of Use in Paragraph 87.

88.     Paragraph 88 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the allegations in Paragraph 88.

89.     Paragraph 89 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the characterizations of the Order Submission Agreement in Paragraph 89.

90.     Paragraph 90 contains legal conclusions to which no response is required. To the extent that a response is required to these allegations, Defendants deny the allegations in Paragraph 90.

91.     Defendants deny the allegations in the first sentence of Paragraph 91. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 91, and therefore the allegations are denied.

92.     Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 92, and therefore the allegations are denied.

93. Defendants deny the allegations in the first sentence of Paragraph 93. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 93, and therefore the allegations are denied.

94. Defendants admit that the HWD invoice page identifies the HOA, the document package, and the fee, but denies the remaining allegations in Paragraph 94.

95. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95, and therefore the allegations are denied.

96. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 96, and therefore the allegations are denied.

97. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 97, and therefore the allegations are denied.

98. Defendants deny the allegations in the first sentence of Paragraph 98. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 98, and therefore the allegations are denied.

99. Defendants deny the allegations in the first sentence of Paragraph 99. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 99, and therefore the allegations are denied.

100. Defendants deny the allegations in the first sentence of Paragraph 100. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 100, and therefore the allegations are denied.

101. Defendants deny the allegations in Paragraph 101.

102.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 102, and therefore the allegations are denied.

103.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 103, and therefore the allegations are denied.

104.   Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 104, and therefore the allegations are denied.

105.   Defendants admit that InspectHOA was previously used as an assumed business name of TOMTE, LLC before the entity adopted the name Rexera. Defendants admit that IH Closing and Elite Closing are names associated with Rexera's operations. Defendants admit that IHOA Title and Point 72 Realty are brand and/or domain names associated with TOMTE, LLC. Defendants deny that the entities identified in Paragraph 105 operated independently of Rexera or had any purpose other than to facilitate Rexera's document-retrieval services on behalf of title companies and lenders in connection with specific real estate transactions. Defendants deny any remaining allegations in Paragraph 105.

106.   Defendants admit that Rexera has registered user accounts, logged in, initiated orders, placed orders, and canceled orders through Uhlig's Online Ordering Sites, but Defendants deny any remaining allegations in Paragraph 106.

107.   Defendants admit that IH Closing and InspectHOA began ordering through Uhlig's Ordering Sites in or around 2020 and 2021, and that in August 2023, Uhlig suspended accounts associated with IHClosing.com and InspectHOA.com email domains. Defendants deny that the suspension was justified by "excessive website traffic" or

"suspected misuse" and aver the Uhlig provided no explanation for the suspension despite Rexera's requests. Defendants deny any remaining allegation in Paragraph 107.

108. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 108, and therefore the allegations are denied.

109. Defendants admit that Rexera registered multiple user accounts on the Uhlig Systems. Defendants deny that "many or most" of those accounts were created "using false, fictitious, deceptive and/or misleading identities and user data for the apparent purpose of evading Uhlig's security measures." Defendants deny the remaining allegations in Paragraph 109.

110. Defendants deny the allegations in Paragraph 110.

111. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in the first and last sentences of Paragraph 111, and therefore the allegations are denied. Defendants deny the remaining allegations of Paragraph 111.

112. Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 112, and therefore the allegations are denied.

113. Defendants deny that any of them have engaged in "deceptive efforts to circumvent Uhlig's security measures" as alleged in the first sentence of Paragraph 113. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 113, and therefore the allegations are denied.

114. Defendants deny the allegations in Paragraph 114.

115. Defendants deny the allegations in Paragraph 115 to the extent they characterize unused registrations as evidence of "failed attempts to circumvent" security

measures. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations and therefore these allegations are denied.

116. Defendants admit that Rexera and entities associated with Rexera logged onto the Uhlig Ordering Sites and that a percentage of those logins did not result in completed orders. Defendants deny the remaining allegations in Paragraph 116.

117. Defendants deny the allegations in Paragraph 117.

118. Defendants deny the allegations in the first sentence of Paragraph 118. Defendants lack knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 118, and therefore the allegations are denied.

119. Defendants deny the allegations in Paragraph 119.

120. Defendants deny the allegations in Paragraph 120.

121. Defendants deny the allegations in Paragraph 121.

122. In response to the allegations in Paragraph 122, Defendants admits Rexera executed Uhlig User Agreements in connection obtaining documents from Uhlig customers, but Defendants deny the remaining allegations in Paragraph 122.

123. In response to the allegations in Paragraph 123, Defendants admit that Rexera charges for its services, but deny the remaining allegations in Paragraph 123.

124. Defendants deny the allegations in Paragraph 124.

125. Defendants deny the allegations in Paragraph 125.

126. Defendants deny the allegations in Paragraph 126.

## FIRST CLAIM FOR RELIEF

### Against Rexera and HWD

### (Breach of Contract – Terms of Use)

127. Defendants incorporate their responses to the preceding paragraphs as though fully set forth herein.

128. Paragraph 128 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Terms of Use and deny that Defendants violated the Terms of Use.

129. Paragraph 129 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Terms of Use and deny that Defendants violated the Terms of Use.

130. Paragraph 130 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Terms of Use and deny that Defendants violated the Terms of Use.

131. Paragraph 131 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Terms of Use and deny that Defendants violated the Terms of Use.

132. Paragraph 132 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Terms of Use and deny that Defendants violated the Terms of Use.

133. Paragraph 133 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Terms of Use and deny that Defendants violated the Terms of Use.

134. Paragraph 134 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Terms of Use and deny that Defendants violated the Terms of Use.

135. Defendants admit that Rexera agreed to abide by certain versions of the Terms of Use. Defendants deny any remaining allegations in Paragraph 135.

136. Defendants admit that entities associated with Rexera accepted the Terms of Use. Defendants deny the characterization that these entities were "merely aliases used by Rexera" and deny any remaining allegations in Paragraph 136.

137. Paragraph 137 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Terms of Use and deny that Defendants violated the Terms of Use.

138. Defendants deny the allegations of Paragraph 138.

139. Defendants deny the allegations of Paragraph 139.

140. Paragraph 140 contains legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that the Terms of Use constitute a contract between Uhlig and users who accept them, but Defendants deny that any contract in this regard is "valid and enforceable" as applied to the conduct at issue. Defendants deny any remaining allegations in Paragraph 140.

141. Defendants deny the allegations in Paragraph 141.

142. Defendants deny the allegations in Paragraph 142.

143. Defendants deny the allegations in Paragraph 143.

144. Defendants deny the allegations in Paragraph 144.

145.   Defendants deny the allegations in Paragraph 145.

146.   Defendants deny the allegations in Paragraph 146.

147.   Defendants deny the allegations in Paragraph 147.

148.   Defendants deny the allegations in Paragraph 148.

149.   Defendants deny the allegations in Paragraph 149.

150.   Defendants deny the allegations in Paragraph 150.

151.   Defendants deny the allegations in Paragraph 151.

152.   Defendants deny the allegations in Paragraph 152.

## SECOND CLAIM FOR RELIEF

### Against Rexera and HWD
### (Breach of Contract – Account Registration Agreement)

153.   Defendants incorporate their responses to the preceding paragraphs as though fully set forth herein.

154.   Paragraph 154 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Account Registration Agreement and deny that Defendants violated its terms.

155.   Paragraph 155 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants admit that Rexera registrants agreed to abide by the enforceable provisions within the Account Registration Agreement. Defendants deny any remaining allegations in Paragraph 155.

156.   Paragraph 156 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants admit that entities associated with Rexera accepted the Account Registration Agreement. Defendants deny the

**Defendant/Counter-Plaintiffs' Amended
Counterclaims and Answer to Amended Complaint**                    **Page 54 of 69**

characterization that these entities are "merely aliases used by Rexera." Defendants deny any remaining allegations in Paragraph 156

157.    Paragraph 157 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Account Registration Agreement and deny that Defendants violated its terms.

158.    Defendants deny the allegations in Paragraph 158.

159.    Defendants deny the allegations in Paragraph 159.

160.    Paragraph 160 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants admit that the Account Registration Agreement constitutes a contract between Uhlig and users who accept the agreement, but Defendants deny that any contract in this regard is "valid and enforceable" as applied to the conduct at issue. Defendants deny any remaining allegations in Paragraph 160.

161.    Defendants deny the allegations in Paragraph 161.

162.    Defendants deny the allegations in Paragraph 162.

163.    Defendants deny the allegations in Paragraph 163.

164.    Defendants deny the allegations in Paragraph 164.

165.    Defendants deny the allegations in Paragraph 165.

166.    Defendants deny the allegations in Paragraph 166.

167.    Defendants deny the allegations in Paragraph 167.

168.    Defendants deny the allegations in Paragraph 168.

169.    Defendants deny the allegations in Paragraph 169

170.    Defendants deny the allegations in Paragraph 170

171.    Defendants deny the allegations in Paragraph 171.

172.    Defendants deny the allegations in Paragraph 172.

## THIRD CLAIM FOR RELIEF

### Against Rexera and HWD
### (Breach of Contract – Order Submission Agreement)

173.    Defendants incorporate their responses to the preceding paragraphs as though fully set forth herein.

174.    Paragraph 174 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Order Submission Agreement and deny that Defendants violated its terms.

175.    Paragraph 175 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants admit that Rexera agreed to the Order Submission Agreements in connection with orders for information from Uhlig, but Defendants deny the remaining allegations in Paragraph 175.

176.    Defendants deny the allegations in Paragraph 176.

177.    Paragraph 177 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants deny the characterizations of the Order Submission Agreement and deny that Defendants violated its terms.

178.    Defendants deny the allegations in Paragraph 178.

179.    Defendants deny the allegations in Paragraph 179.

180.    Paragraph 180 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants admit that the Order

Submission Agreement constitutes a contract between Uhlig and users who accept it, but deny that it is "valid and enforceable" as applied to the conduct at issue. Defendants deny any remaining allegations in Paragraph 180.

181. Defendants deny the allegations in Paragraph 181.

182. Defendants deny the allegations in Paragraph 182.

183. Defendants deny the allegations in Paragraph 183.

184. Defendants deny the allegations in Paragraph 184.

185. Defendants deny the allegations in Paragraph 185.

186. Defendants deny the allegations in Paragraph 186.

187. Defendants deny the allegations in Paragraph 187.

188. Defendants deny the allegations in Paragraph 188.

189. Defendants deny the allegations in Paragraph 189.

190. Defendants deny the allegations in Paragraph 190.

191. Defendants deny the allegations in Paragraph 191.

192. Defendants deny the allegations in Paragraph 192.

## FOURTH CLAIM FOR RELIEF

### Against All Defendants

### (Unjust Enrichment)

193. Defendants incorporate their responses to the preceding paragraphs as though fully set forth herein.

194. Defendants deny the allegations in Paragraph 194.

195. Defendants deny the allegations in Paragraph 195.

196. Defendants deny the allegations in Paragraph 196.

197.   Defendants deny the allegations in Paragraph 197.

198.   Defendants deny the allegations in Paragraph 198.

199.   Defendants deny the allegations in Paragraph 199.

200.   Defendants deny the allegations in Paragraph 200

201.   Defendants deny the allegations in Paragraph 201.

202.   Defendants deny the allegations in Paragraph 202.

## FIFTH CLAIM FOR RELIEF

### Against All Defendants
### (KUTSA – Misappropriation of Trade Secrets)

203.   Defendants incorporate their responses to the preceding paragraphs as though fully set forth herein.

204.   In response to the allegations in Paragraph 204, Defendants deny that Uhlig's compilations of Community Information constitute trade secrets under any applicable law. Defendants deny the remaining allegations in Paragraph 204.

205.   Defendants deny the allegations in Paragraph 205.

206.   Defendants deny the allegations in Paragraph 206.

207.   Defendants deny the allegations in Paragraph 207.

208.   Defendants deny the allegations in Paragraph 208.

209.   Defendants deny the allegations in Paragraph 209.

210.   Defendants deny the allegations in Paragraph 210.

211.   In response to the allegations in Paragraph 211, Defendants admit that the User Agreements reference trade secrets, but Defendants deny that Uhlig's compilations of

Community Information constitute trade secrets. Defendants deny the remaining allegations in Paragraph 211.

212. Defendants deny the allegations in Paragraph 212.

213. Paragraph 213 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants admit that the Uhlig User Agreements include certain prohibitions set forth in the agreements, but Defendants deny any remaining allegations Paragraph 213.

214. Defendants deny the allegations in Paragraph 214.

215. Defendants deny the allegations in Paragraph 215.

### SIXTH CLAIM FOR RELIEF

### Against All Defendants

### (DTSA, 18 U.S.C. § 1836(c) – Misappropriation of Trade Secrets)

216. Defendants incorporate their responses to the preceding paragraphs as though fully set forth herein.

217. In response to the allegations in Paragraph 217, Defendants deny that Uhlig's compilations of Community Information constitute trade secrets under any applicable law. Defendants deny the remaining allegations in Paragraph 217.

218. Defendants deny the allegations in Paragraph 218.

219. Defendants deny the allegations in Paragraph 219.

220. Defendants deny the allegations in Paragraph 220.

221. Defendants deny the allegations in Paragraph 221.

222. Defendants deny the allegations in Paragraph 222.

223. Defendants deny the allegations in Paragraph 223.

224. In response to the allegations in Paragraph 224, Defendants admit that the User Agreements reference trade secrets, but Defendants deny that Uhlig's compilations of Community Information constitute trade secrets. Defendants deny the remaining allegations in Paragraph 224.

225. Defendants deny the allegations in Paragraph 225

226. Paragraph 226 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants admit that the Uhlig User Agreements include certain prohibitions set forth in the agreements, but Defendants deny any remaining allegations Paragraph 226.

227. Defendants deny the allegations in Paragraph 227.

228. Defendants deny the allegations in Paragraph 228.

## SEVENTH CLAIM FOR RELIEF

### Against Rexera

### (Violation of Computer Fraud and Abuse Act, 18 U.S.C. § 1030)

229. Defendants incorporate their responses to the preceding paragraphs as though fully set forth herein.

230. Defendants admit that the Uhlig Systems are used for interstate communication and commerce. Defendants deny that the Uhlig Systems qualify as "protected computers" for purposes of the CFAA claims alleged and deny any remaining allegations in Paragraph 230.

231. Defendants deny the allegations in Paragraph 231.

232. Defendants deny the allegations in Paragraph 232.

233. Defendants deny the allegations in Paragraph 233.

234. Defendants deny the allegations in Paragraph 234.

235. Defendants deny the allegations in Paragraph 235.

236. Defendants deny the allegations in Paragraph 236.

## EIGHTH CLAIM FOR RELIEF

### Against All Defendants

### (Unfair Competition)

237. Defendants incorporate their responses to the preceding paragraphs as though fully set forth herein.

238. Paragraph 238 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 238, and therefore such allegations are denied.

239. In response to the allegations in Paragraph 239, Defendants admit that HWD and Uhlig compete for customers in certain sectors of HWD's business. Defendants deny the remaining allegations in Paragraph 239.

240. In response to the allegations in Paragraph 240, Defendants admit that HWD and Uhlig compete for customers in certain sectors of HWD's business. Defendants deny the remaining allegations in Paragraph 240.

241. In response to the allegations in Paragraph 241, Defendants admit that HWD and Uhlig compete for customers in certain sectors of HWD's business. Defendants deny the remaining allegations in Paragraph 241.

242. In response to the allegations in Paragraph 242, Defendants admit that HWD sent marketing e-mails concerning its Global Search function and the use of Rexera, but deny the remaining allegations in Paragraph 242.

243. Defendants deny the allegations in Paragraph 243.

244. Defendants deny the allegations in Paragraph 244.

245. Defendants deny the allegations in Paragraph 245.

246. Defendants deny the allegations in Paragraph 246.

247. Defendants deny the allegations in Paragraph 247.

## NINTH CLAIM FOR RELIEF

### Against All Defendants

### (Violations of 15 U.S.C. § 1125(a))

248. Defendants incorporate their responses to the preceding paragraphs as though fully set forth herein.

249. Paragraph 249 contains legal conclusions to which no response is required. To the extent that a response is deemed required, Defendants lack knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 249, and therefore such allegations are denied

250. In response to the allegations in Paragraph 250, Defendants admit that HWD and Uhlig compete for customers in certain sectors, but Defendants deny the remaining allegations in Paragraph 250.

Defendant/Counter-Plaintiffs' Amended
Counterclaims and Answer to Amended Complaint                    Page 62 of 69

251. In response to the allegations in Paragraph 251, Defendants admit that HWD and Uhlig compete for customers in certain sectors, but Defendants deny the remaining allegations in Paragraph 251.

252. Defendants deny the allegations in Paragraph 252.

253. In response to the allegations in Paragraph 253, Defendants admit that HWD and Uhlig compete for customers in certain sectors, but Defendants deny the remaining allegations in Paragraph 253.

254. In response to the allegations in Paragraph 254, Defendants admit that HWD sent marketing e-mails concerning its Global Search function and the use of Rexera, but deny the remaining allegations in Paragraph 254.

255. Defendants deny the allegations in Paragraph 255.

256. Defendants deny the allegations in Paragraph 256.

257. Defendants deny the allegations in Paragraph 257.

**PRAYER FOR RELIEF**

258. Defendants deny any allegations in the Prayer for Relief, deny that Uhlig is entitled to any of the relief requested in the Prayer for Relief, and deny every allegation not specifically admitted herein.

**DEFENSES**

Defendants assert the following defenses without assuming any burden of proof or persuasion that applicable law does not place on Defendants:

**I.      Failure to State a Claim**

259.   The Complaint, in whole or in part, fails to state a claim upon which relief can be granted.

**II.     Illegality, Public Policy, and Unenforceability**

260.   Rexera acts as an authorized requestor under the statutes of multiple states that require associations to deliver disclosure documents and related closing documents to owners, mortgagees, and their authorized agents and designees. Uhlig's User Agreements, to the extent they purport to restrict access by authorized requestors to statutorily mandated disclosures, are unenforceable as contrary to public policy and illegal under applicable state law. The User Agreements are contracts of adhesion presented on a take-it-or-leave-it basis. The sole alternative, Uhlig's Manual Ordering Process, is designed to be commercially unviable. Defendants further plead as a defense any statutory provision that permits Defendants' actions or conduct. This defense applies to all claims.

**III.    Unclean Hands**

261.   Uhlig comes to this Court with unclean hands. Uhlig has used its PMC contracts, a commercially unviable manual ordering process, and a coordinated disinformation campaign to prevent PMCs and HOAs from delivering documents to authorized requestors through any channel except CondoCerts. Represented by the same counsel in every case, Uhlig has filed multiple lawsuits in the past five years and has not

proceeded to trial in any of them. On information and belief, Uhlig allows other companies to access the CondoCerts platform using methods substantially similar to Rexera's, including AI-assisted tools, while singling out Rexera for litigation because RealPage owns a platform that competes with CondoCerts and because RealPage rejected Uhlig's demand that RealPage pay $85 million over fair market value to acquire CondoCerts. Uhlig's inequitable conduct is directly connected to the claims asserted in this action.

## IV.    Failure to Mitigate Damages

262.    Uhlig has failed to mitigate its claimed damages. Rexera paid Uhlig's full asking price for every document ordered through the platform. Uhlig terminated Rexera's access in March 2026, stopping any further ordering activity. Uhlig rejected multiple proposals from RealPage to establish a transparent, monitored access arrangement.

## V.    Waiver and Estoppel

263.    Uhlig waived and is estopped from asserting any claims based on Rexera's use of the Ordering Sites. Uhlig was aware of Rexera's ordering activity for years before filing this action. Uhlig accepted payment for every document Rexera ordered. Uhlig's platform contains no meaningful identity verification or access controls. Uhlig suspended Rexera's predecessor accounts in August 2023 without explanation.

## VI.    Statute of Limitations

264.    Uhlig's claims are barred, all or in part, by the applicable statutes of limitations.

**Defendant/Counter-Plaintiffs' Amended**
**Counterclaims and Answer to Amended Complaint**                    Page 65 of 69

## VII.    Unjust Enrichment Barred by Express Contract

265.    Uhlig's unjust enrichment claim (Count IV) is barred because the parties' relationship is governed by express contracts. Unjust enrichment does not lie where an express contract governs the subject matter of the dispute.

## VIII.    KUTSA Preemption

266.    Uhlig's claims are preempted and/or barred, all or in part, by the Kansas Uniform Trade Secrets Act.

## IX.    Collateral Estoppel and Issue Preclusion

267.    Uhlig's claims are barred, in whole or in part, by collateral estoppel and issue preclusion, including by rulings from courts in this District on whether Uhlig's compilations of community information qualify as protectable trade secrets. Defendants do not limit this defense to any single prior determination and will identify the full scope of precluded issues as discovery proceeds.

## X.    Truthful Statements and Lawful Competition

268.    The marketing statements that Uhlig attacks are substantially true. HWD, through its relationship with Rexera, does offer document-retrieval services for HOAs nationwide. Rexera retrieves specific documents for specific closings for specific clients and pays the full price for any charges associated with obtaining any documents. The representation that HWD customers can order documents from any HOA in the country directly through HWD describes a legitimate service capability. Truth is a complete defense to an unfair competition claim and to a Lanham Act false advertising claim.

## XI.   Nominative Fair Use

269.   To the extent Defendants have referenced CondoCerts or Uhlig by name in any communications, such references were made solely to identify the platform from which documents would be obtained. The use of the term did not suggest sponsorship or endorsement by Uhlig. This constitutes nominative fair use. Accurately identifying the source of a document or the platform through which a document originates is permissible and does not constitute unfair competition or a violation of 15 U.S.C. § 1125(a).

## XII.   Legitimate Competition / Pro-Competitive Justification

270.   Defendants' conduct constitutes lawful market competition HWD and Rexera are providing customers with an additional channel through which to obtain disclosure documents and other closing documents—documents that state law requires associations to produce. Offering consumers a competing service that expands access and choice is not unfair competition. The benefits of competition outweigh any anticompetitive harms to Uhlig, particularly because Uhlig is paid in full for each transaction.

## XIII.   First Amendment Protects Non-Misleading Commercial Speech

271.   To the extent Uhlig seeks to enjoin Defendants' marketing communications about the scope of services offered, such relief implicates First Amendment protections for commercial speech.

## XIV.   Reservation of Defenses

272.   Defendants reserve the right to assert additional defenses as may become available through discovery or further investigation.

Respectfully submitted,

**REESE MARKETOS LLP**

*/s/ Pete D. Marketos* _____
Pete D. Marketos (*pro hac vice*)
Texas State Bar No. 24013101
pete.marketos@rm-firm.com
Brett S. Rosenthal (*pro hac vice*)
Texas State Bar No. 24080096
brett.rosenthal@rm-firm.com
Bradley M. Gordon (*pro hac vice*)
Texas State Bar No. 00784150
brad.gordon@rm-firm.com
Jamison M. Joiner (*pro hac vice*)
Texas State Bar No. 24093775
jamison.joiner@rm-firm.com

750 N. Saint Paul St., Suite 600
Dallas, Texas 75201-3201
214.382.9810 telephone
214.501.0731 facsimile

*/s/ Michael T. Raupp* _____
Michael T. Raupp, KS Bar No. 25831
Mitchell J. Perne, KS Bar No. 31102
HUSCH BLACKWELL LLP
4801 Main Street, Suite 1000
Kansas City, MO 64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080
michael.raupp@huschblackwell.com
mitchell.perne@huschblackwell.com

*Counsel for Defendants/Counter-Plaintiffs RealPage, Inc. and TOMTE, LLC d/b/a Rexera, and Nextlevel Association Solutions, Inc. d/b/a HomeWiseDocs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2026, I filed the foregoing document via the Court's ECF system, which will cause a true and correct copy of the same to be served electronically on all ECF-registered counsel of record.

*/s/ Michael T. Raupp*

*Counsel for Defendants/Counter-Plaintiffs RealPage, Inc. and TOMTE, LLC d/b/a Rexera and Nextlevel Association Solutions, Inc., d/b/a HomeWiseDocs*